# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **TEAM CAM, LLC**<br>701 Evelyn Avenue<br>Linthicum Heights, Anne Arundel County, MD 21090<br><br>**v.**<br><br>**RELIABLE CONTRACTING COMPANY, INC.**<br>2410 Evergreen Road, Suite 200<br>Gambrills, Anne Arundel County, MD 21054<br><br>**FRANCIS O. DAY CO., INC.**<br>850 East Gude Drive, Suite A<br>Rockville, Montgomery County, MD 20850<br><br>**ALLAN MYERS MD, INC.**<br>2011 Belair Road<br>Fallston, Harford County, MD 21047<br><br>**HOLCIM-MAR, INC. D/B/A AGGREGATE INDUSTRIES**<br>6401 Golden Triangle Drive, Suite 400<br>Greenbelt, Prince George's County, MD 20770<br><br>**MIDLANTIC MARKING, INC.**<br>28008 Kemptown Church Road<br>Damascus, Montgomery County, MD 20872<br><br>**THE MARYLAND ASPHALT ASSOCIATION, INC.**<br>2408 Peppermill Drive, Suite G<br>Glen Burnie, Anne Arundel County, MD 21061 | CASE NO.: 8:24-cv-1545<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT AND DEMAND FOR JURY TRIAL

For its complaint against Defendants and each of them, plaintiff Team Cam, LLC ("Team Cam") alleges based upon personal knowledge and information and belief as follows:

## I.    <u>INTRODUCTION</u>

1.    Under the antitrust laws, dominant incumbents cannot conspire to drive nascent competitors out of business. While this is true in every aspect of the economy, it is especially important in the road paving industry, which is rife with a history of collusion. With road paving, competition is essential to ensure that state and local governments receive the best, and most competitive bids for paving contracts. When, however, the largest, most entrenched competitors work together to eliminate a rival—a rival that innovates, improves quality, and brings costs down—competition is eliminated, and the antitrust laws are violated. This is what happened here.

2.    In 2019, Team Cam entered the Eastern Maryland highway paving market. It did so as an upstart, challenging entrenched incumbents who had controlled highway paving in the state for decades. Yet Team Cam's founder and president, Ryan Blades, was confident. He set an ambitious goal: reach $100 million in annual revenue in five years. He had a plan to achieve that goal.

3.    Team Cam gained a foothold and experience in the market by winning smaller paving contracts. Team Cam quickly built a reputation for quality and efficiency. Team Cam then invested heavily in expanding. It spent $6 million hiring more workers and buying new trucks and equipment, and it got access to more bonding capacity—insurance that compensates project owners, subcontractors, or suppliers if a contractor does not perform—which is a requirement for competing for large contracts. Team Cam then began bidding on and winning bigger projects.

4.    Mr. Blades' plan was working. Team Cam grew from $5 million in revenue in 2019 to $8 million in 2020. Then it reached $16.3 million in 2021. By mid-2022, Team Cam's annual revenue was on track to hit $40 million, and then the federal government passed an infrastructure bill allocating an additional $4.6 *billion* in funding for Maryland highways and bridges. Mr. Blades' goal of reaching $100 million in annual revenue within 5 years—which had once seemed

optimistic—was well within reach. But then the industry's dominant incumbents collectively took notice.

5.    Beginning in at least 2022, a group of the largest highway paving contractors in Maryland started conspiring to drive Team Cam from the market. Their strategy involved employing several means and methods but centered on the fact that, in addition to being Team Cam's direct competitors for road paving contracts, they were also its only viable suppliers of asphalt needed for projects.

6.    The conspirators started by sabotaging Team Cam's bids. Then they agreed to impose the same extractive price terms on Team Cam, demanding that it pass along state price adjustments and incentives, which had always been meant to go to contractors, not their suppliers. When Mr. Blades refused their demands, they began interfering with Team Cam's ability to get asphalt and perform its contracts. Then they began harassing Team Cam's surety with a barrage of specious claims. Finally, they outright refused to supply asphalt to Team Cam.

7.    All the incumbents' activity was coordinated. Cartels of the sort that targeted Team Cam usually try to hide their activities. But these conspirators were not so shy. They explicitly told Mr. Blades, sometimes in writing, that they discussed raising prices on Team Cam with one another. They told him that the spurious bonding claims were part of the industry "stick[ing] together." They even admitted to him that they discussed refusing to sell Team Cam asphalt.

8.    In mid-2023, the conspirators achieved their goal of driving Team Cam out of business. The bonding company had initially resisted the cartel's attacks, but it eventually succumbed. It took control of Team Cam's receivable accounts, meaning Team Cam could no longer get paid for work it had already done. Team Cam had also lost the ability to buy asphalt reliably. It had to stop bidding on paving contracts entirely.

9. Finally, the surety, at the conspirators' behest, forced Team Cam to sell its assets to Reliable, one of the co-conspirators, for pennies on the dollar. The surety even pressured Team Cam to sign a release of antitrust claims against one of rival contractors with whom it was now conspiring.

10. After the elimination of Team Cam as a competitor, Reliable hired Mr. Blades and several other Team Cam employees. Mr. Blades presumed his hiring was meant to aid with the transition. In truth, it was a final attempt at humiliation. On Mr. Blades' first day of work, Reliable's COO called him into a room with the CEO and an HR employee. Reliable employees had already ripped the logo off one of Team Cam's trucks, and they displayed it in front of the building. The COO put a hat with a Reliable logo on Mr. Blades and took pictures, laughing as he texted them to others. They and their conspirators had killed Team Cam, and now they were displaying him as their trophy.

## II.    **<u>JURISDICTION AND VENUE</u>**

11. This action arises under the antitrust laws of the United States, including Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

12. Subject matter jurisdiction is founded on 28 U.S.C. §§ 1331 and 1337(a).

13. Venue is proper in this District under 28 U.S.C. § 1391(b)-(c) because many of the alleged acts occurred in the District of Maryland and the Defendants are found, reside, and/or transact business in the District of Maryland.

14. Additionally, the violations of law alleged in this Complaint took place in this judicial district and have injured Team Cam in this district. Venue is therefore appropriate in the District of Maryland under Section 12 of the Clayton Act, 15 U.S.C. § 22.

15.     The manufacture, marketing, sale, and distribution of asphalt and the provision of heavy highway paving services, and the actions complained of in this Complaint, occur in and substantially affect interstate commerce.

## III.    PARTIES

### A.      Plaintiff Team Cam, LLC

16.     Plaintiff Team Cam, LLC ("Team Cam") is a Maryland limited liability corporation with its principal place of business at 701 Evelyn Avenue, Linthicum Heights, Maryland 21090.

### B.      Defendants

17.     Defendant Reliable Contracting Company ("Reliable") is a corporation organized and existing under the laws of the state of Maryland with its principal offices located at 2410 Evergreen Road, Suite 200, Gambrills, Maryland 21054.

18.     Defendant Francis O. Day Co., Inc. ("F.O. Day") is a corporation organized and existing under the laws of the state of Maryland with its principal offices located at 850 East Gude Drive, Suite A, Rockville, Montgomery County, Maryland 20850.

19.     Defendant Allan Myers MD, Inc. ("Allan Myers") is a corporation organized and existing under the laws of the state of Maryland with its principal offices located at 2011 Belair Road, Fallston, Harford County, Maryland 21047.

20.     Defendant Holcim-Mar, Inc. d/b/a Aggregate Industries ("Holcim") is a corporation organized and existing under the laws of the state of Maryland with its principal offices located at 6401 Golden Triangle Drive, Suite 400, Greenbelt, Prince George's County, Maryland 20770.

21.     Defendants Reliable, F.O. Day, Allan Myers, and Holcim shall be referred to collectively as "Rival-Supplier Defendants" in this Complaint.

22.    Defendant Maryland Asphalt Association, Inc. ("MAA") is a corporation organized and existing under the laws of the state of Maryland with its principal offices located at 2408 Peppermill Drive, Suite G, Glen Burnie, Anne Arundel County, Maryland 21061.

23.    Defendant Midlantic Marking, Inc. ("Midlantic") is a corporation organized and existing under the laws of the state of Delaware with its principal offices located at 28008 Kemptown Church Road, Damascus, Montgomery County, Maryland 20872.

## IV.    STATEMENT OF FACTS

### A.    OVERVIEW OF MARYLAND HIGHWAY ASPHALT PAVING

24.    Maryland state highway projects are administered by the State Highway Administration ("SHA"), an agency under the Maryland Department of Transportation ("MDOT"). Each county government in Maryland also administers smaller paving contracts within its territory.

25.    The SHA divides the state geographically into seven administrative districts, each comprised of two to five counties. This Complaint focuses on conduct affecting competition for state highway paving contracts in Districts 1, 2, 3, and 5, which comprise 15 counties in eastern Maryland.



26.    The SHA and each county award asphalt paving contracts through a competitive bidding process. The SHA and the counties publish notices of upcoming projects on their website and in the Maryland Register, a biweekly publication of the state government. The notices include information such as the project location, scope, estimated cost, and bid submission deadline.

27.    One of the benefits of competitive bidding is that it allows the contracting agency to obtain the best value for the public funds. More bids mean more competition among the contractors, which can drive down the prices and improve the quality of the work. When there are fewer bids, the contractors have less incentive to lower their prices or offer better services, and they can take advantage of the agency's limited options. Therefore, by encouraging more bids, the state or county could complete a project at a lower price and save taxpayer money.

28.    For paving projects of sufficient size, a key requirement for contractors is that they must be bonded, meaning that they must obtain bonding insurance from a surety. A bond is a guarantee that the contractor will perform the work according to the contract terms and pay its

7

subcontractors and suppliers. If the contractor fails to do so, the surety will cover the losses incurred by the agency or the other parties.

29.     A contractor's ability to compete for contracts thus depends largely on its bonding capacity, meaning the maximum amount of work that the contractor can bond at any given time. A contractor's bonding capacity is determined by the surety based on the contractor's financial strength, reputation, and track record. The higher the bonding capacity, the more and larger projects the contractor can bid on.

30.     The SHA and counties evaluate bids submitted by the contractors to identify the lowest responsive and responsible bid. A responsive bid is one that conforms to all the requirements and specifications of the project. A responsible bid is one that demonstrates the contractor's ability and integrity to perform the work. Contracting agencies award contracts to the bidder who meets these criteria and offers the lowest price. The agency then issues a notice to proceed, which authorizes the contractor to begin work on the project.

31.     When the time comes for a contractor to perform an asphalt paving contract, it must first obtain asphalt from a plant. Asphalt is a mixture of aggregates (such as sand, gravel, and crushed stone), asphalt cement (a petroleum product that acts as a binder), and additives (such as polymers, fibers, or modifiers) that enhance the performance of the pavement. Asphalt is produced at a plant by heating and drying the aggregates, then mixing them with the asphalt cement and additives in a drum or a batch mixer. The resulting "hot mix asphalt" is stored in silos until it is ready to be loaded onto trucks for delivery.

32.     A contractor who needs asphalt for a paving project must first obtain a ticket from the plant, which specifies the quantity, type, and temperature of the asphalt. The ticket also contains information about the project, such as the location, date, time, and contract number. The contractor

then drives the truck to the loading station, where the asphalt is transferred from the silo to the truck bed. The truck bed is covered with a tarp to retain heat and prevent moisture from entering the asphalt.

33.     The contractor then transports the asphalt to the project site, following the route and schedule specified by the contracting agency. The transportation time is critical, as the asphalt must maintain a minimum temperature of 250°F to be workable. To monitor the temperature, the contractor uses a thermometer or an infrared device to check the asphalt at the plant, during transit, and at the site. If the asphalt cools below the minimum temperature, it may become stiff, brittle, and difficult to compact. It is thus ideal to source asphalt from a plant within 30 minutes of a job site, though plants within 30-60 minutes' distance may be viable temporarily or as a replacement if a nearer plant is no longer an option. As a result, competition in the Maryland asphalt paving markets and asphalt supply markets tend to be constrained geographically.

34.     Each SHA district has only a few asphalt plants, usually owned by one or two dominant contractors.

35.     At the project site, the contractor unloads the asphalt from the truck and places it on the prepared surface using a paver machine. The paver machine spreads and levels the asphalt to the required thickness and width, according to the specifications of the project. The asphalt is then compacted by a series of rollers, which apply pressure and vibration to achieve the desired density and smoothness of the pavement. The compaction process must be done quickly, while the asphalt is still hot and pliable.

36.     After a project is completed, the contracting agency assigns a rating to the prime contractor's performance based on quality, safety, timeliness, and other metrics. Achieving a high rating is necessary to qualify to bid on future projects.

**B.  TEAM CAM ENTERS AND QUICKLY EXPANDS IN EASTERN MARYLAND HIGHWAY ASPHALT PAVING MARKETS**

37.     Team Cam began preparing to compete for Maryland heavy highway paving contracts in 2019, and it bid on its first major road contract in December 2019. Team Cam started its first major road contract in Anne Arundel County, which is where it is headquartered.

38.     Team Cam entered a highly concentrated paving market in eastern Maryland. The SHA put up 24 contracts for bidding in eastern Maryland in 2019. The four paving Defendants and co-conspirator David A. Bramble, Inc. ("Bramble") were the apparent low bidders on 21 of those contracts, accounting for $88.8 million or 97% of the total.

2019 SHA Lettings in Districts 1, 2, 3 & 5 – Apparent Low Bidders

| Contractor (bold = conspirator) | Bids Won | Total (millions) | Share |
|---|---|---|---|
| **Allan Myers** | 10 | $40.5 | 44.2% |
| **F.O. Day** | 3 | $15.4 | 16.8% |
| **Reliable** | 1 | $12.4 | 13.5% |
| **Bramble** | 5 | $10.6 | 11.6% |
| **Holcim** | 2 | $9.9 | 10.8% |
| Others | 3 | $2.8 | 3.0% |

39.     Team Cam differed from the dominant paving incumbents in that it did not operate its own asphalt plants. Team Cam thus was not tied to any geographic area to the extent of its rivals. Of course, this meant that Team Cam had to obtain asphalt from third parties, and in each case, those third parties were rival asphalt paving contractors. Often, they were bidding against Team Cam for the same SHA projects. Although they competed against Team Cam, it was in their unilateral self-interest to supply Team Cam because if they lost a bid, they could still profit from the sale of asphalt to Team Cam.

40.     The process for Team Cam obtaining asphalt from rival suppliers typically followed the same pattern. When Team Cam decided to bid on a project, it solicited quotes from one or more asphalt suppliers with plants in close geographic proximity to the project. Proximity is important

because—in addition to maintaining the correct temperature of asphalt during transport—the fuel cost of transporting asphalt is a significant factor in the overall cost of a project. Team Cam typically solicited bids from suppliers with plants within 30 minutes travel time from the project site.

41.    Asphalt suppliers then submitted quotes to Team Cam specifying tonnage prices for different grades of asphalt, as well as various other materials. The quotes included a statement that the quoted prices were based on the then-current Maryland Asphalt Index. Below are examples of such statements from quotes submitted by Defendants to Team Cam:

- **Reliable:** "Prices based on the AC Index of $661.67."

- **F.O. Day:** "The quote is based on the current Maryland liquid asphalt index at the date of this proposal…."

- **Holcim:** "These prices are based on the AC Index of $653.33…."

42.    The quotes typically specified that the quoted prices could float in response to fluctuating input costs. Below are examples of these "floating price" terms:

- **Reliable:** "These prices are not guaranteed and may fluctuate with the price of liquid asphalt."

- **F.O. Day:** "Any changes in the index will be added or subtracted from these prices based on 5% A/C for Base and Surface mixes…. Any increase in costs (including fuel or ingredient materials) will result in the quoted prices being updated accordingly."

- **Holcim:** "These prices … are subject to change with the AC Index…. Any increase in the price of fuel and/or ingredient materials will result in the quoted

prices being adjusted accordingly. This includes liquid asphalt escalation which is subject to fluctuations in the base cost of liquid asphalt "

- **Allan Myers: "**Quotes will be adjusted to reflect the Monthly Posted Asphalt Cement Price when compared to the Project Asphalt Cement Price of $653.33."

43.    This meant that if Team Cam included a supplier's quote in its bid and won a contract, then when the day came for Team Cam to begin performing the contract, the price Team Cam paid for asphalt may be different from the price originally quoted by the supplier.

44.    For example, Team Cam might solicit a quote in March 2022 from a rival supplier, such as Reliable, to bid on an SHA project. Reliable would then respond with a quote for surface asphalt from one of its nearby plants at $53.92 per ton. The quote would include the reference to the Maryland Asphalt Index and the "floating price" terms described above. As of March 2022, the Index was at $601.67. When Team Cam began work on the project eight months later, in November 2022, the Index had risen to $661.67, and Reliable then charged $57.42 per ton. Team Cam would then pay the higher price to Reliable.

45.    When submitting a bid for a state or county project, Team Cam would choose a supplier, mark up its price to account for Team Cam's labor of laying the asphalt, and include the price as a line item in Team Cam's bid. The bid would also include Team Cam's line items for milling, flagging operations, and other materials and services.

46.    One challenge Team Cam faced as a non-self-supplier was the volatile and unpredictable nature of asphalt and diesel pricing. Diesel is important for several reasons. Fluctuations in the price of diesel reflect changes in the price of crude oil, from which the asphalt cement used as a binder in asphalt concrete is derived. Diesel fuel is also used to heat the asphalt

at production and during transport, and it is used to power the trucks that transport the asphalt and the heavy equipment used for milling, laying, and compaction.

47.     Asphalt and diesel price volatility would have severely undermined Team Cam's ability to compete for state and county contracts if not for the fact that Maryland public contracting agencies provide contractors like Team Cam with "price adjustments." Through price adjustments, a contracting agency will pay more or less than a contractor originally bid to offset fluctuations in certain input costs. These price adjustments help reduce the risk to contractors from the potential price volatility of their inputs that occur between the time of bidding and the time of performance of a contract. This allows the contractor to bid more aggressively instead of inflating bids to hedge against the possibility of higher input costs, which ultimately lowers costs for the state or county.

48.     MDOT policies allow for two categories of price "adjustments" to offset input costs that could affect asphalt paving contractors:

- **Diesel fuel:** An adjustment based on fluctuations in the price of diesel fuel.

- **Asphalt binder (sometimes called "liquid"):** An adjustment based on fluctuations in the price of the liquid that binds asphalt.

49.     MDOT policies also allow for two categories of price "incentives" to reward (or punish) contractors for the quality of their performance:

- **Mix design (or asphalt mixture):** An incentive/disincentive available to ensure the laid asphalt conforms to SHA specifications.

- **Pavement density and compaction:** An incentive/disincentive included for contractor performance supporting in-place density and ride smoothness.

50.     As described above, a key requirement for competing for SHA contracts is the ability to obtain bonding from a surety. Team Cam's surety was United Fire Group Insurance

13

("UFG"), a national insurer based out of Cedar Rapids, Iowa. In 2020, UFG extended Team Cam bonding capacity for up to at least $10 million worth of heavy highway contracts.

51.    Team Cam won its first major road contract in December 2019. As of the end of 2019, the company had generated over $5.9 million in revenue. Its revenue would grow quickly over the next two years as it took on state and county road projects.

52.    Team Cam reinvested its profits in growth. In 2020, for example, it spent over $5 million on new vehicles and equipment and increased its headcount to over 100 employees. With the added equipment and labor, it could then handle up to $20 million in contracts. That same year, it was awarded a large road project in Anne Arundel County and grew to nearly $8.2 million in annual revenue.

53.    In 2021, Team Cam completed $10 million of Anne Arundel County work alone, and it secured approximately $30 million in contracts for 2022 and beyond. That same year, Team Cam also began competing for asphalt paving projects outside of Anne Arundel County and District 5. It began winning projects in District 2, across the Chesapeake Bay, as well as Districts 1 and 3. As a result of its rapid expansion, the company's revenue nearly doubled to $16.3 million.

C. **THE CONSPIRATORS TAKE NOTICE OF TEAM CAM AND BEGIN UNDERMINING ITS ABILITY TO COMPETE**

54.    By the end of 2021, the incumbent eastern Maryland contractors took notice of Team Cam. The company was expanding rapidly, including moving into new SHA districts across eastern Maryland. It was also receiving praise from state and county contracting agencies. Team Cam had almost always received A-ratings for its work, and it was getting more bonding capacity. These two factors enabled it to compete for more and larger projects.

55.    In December of 2021, Charl Marais, the General Manager of Asphalt & Contracting at Defendant Holcim, unexpectedly showed up at Team Cam's Christmas party. A General

14

Manager from Defendant Allan Myers, Curtis Hall, unexpectedly appeared as well. At the party, Mr. Marais approached Mr. Blades to propose a business arrangement with Holcim. The parties signed a non-disclosure agreement, and negotiations progressed over the course of the next few months. The discussions culminated in Holcim delivering a non-binding "Indication of Interest" in April 2022, in which it expressed an interest in acquiring Team Cam. Holcim's starting offer was for $10 million based on Team Cam's 2021 performance. Over the course of the next three months, the parties would continue to negotiate the acquisition, though Mr. Marais told Mr. Blades that he would need to obtain approval from their parent entity as well.

56.    During the pre-acquisition negotiations with Holcim, Team Cam continued to expand its operations. Team Cam submitted bids for state and county projects in new counties, including Calvert County. At the time, Holcim and F.O. Day were two of the largest contractors competing for paving contracts in the county. The third competitor was C.A. Bean Inc. ("Bean"), out of California, Maryland.

57.    On April 22, 2022, Team Cam submitted a bid for a pavement overlay and maintenance project for Calvert County ("Project 2022-050"). To maintain an arms-length relationship with Holcim during the acquisition negotiations—and to avoid any appearance of impropriety—Mr. Blades decided to source asphalt for the project from F.O. Day. Team Cam got quotes from F.O. Day for the project, which it used to price its bid. Team Cam's $6.4 million bid for the project was the apparent low bid, meaning that Team Cam preliminarily won the project. It had beaten the other two bidders, Holcim and Bean, by 8.6% and 15.6% respectively.

58.    After Team Cam won the bid for Project 2022-050, a Holcim representative expressed surprise to a Team Cam employee, asking: "[T]he contract that you won last week, I don't see where I sent you prices on that. Who did you get prices from?" Team Cam responded

15

that it was planning to obtain asphalt for the project from F.O. Day. But during the post-bidding process, when F.O. Day submitted its asphalt mix for approval by the county, the county rejected it as failing to meet the project's specifications.

59.     After Calvert County rejected F.O. Day's asphalt mix designs, Mr. Blades contacted F.O. Day to discover the cause of the failure. F.O. Day's representative pleaded ignorance and claimed that F.O. Day did not even produce the asphalt mix specified for the project: "At this point, I am not even sure we have a 15% rap mix design to offer you…."

60.     As a result of F.O. Day's failure to provide the right asphalt mix, and despite an appeal from Team Cam, Calvert County rejected Team Cam's bid and awarded Project 2022-050 to Holcim, the second-place bidder.

61.     It is notable that one year later, the same Calvert County project came up again for re-bidding (this time as "Project 2023-040"). This time, F.O. Day suddenly decided to submit a bid, despite earlier claiming to Team Cam that it lacked the required asphalt mix. While F.O. Day lost the 2023 bid to Holcim, it then won the subsequent rebidding in 2024 ("Project 2024-034").

62.     Holcim's and F.O. Day's 2023 and 2024 bidding activity was concerning in one important respect: Holcim's 2024 bid listed *higher* asphalt prices than it had submitted in 2023. This increase was unusual because the changes in Holcim's asphalt prices historically tracked the Maryland Asphalt Index, as would be expected. When the Maryland Asphalt Index went up, Holcim's asphalt prices went up. When the Index went down, Holcim's prices went down. But over the 10-month period between the Project 2023-040 round won by Holcim and the Project 2024-034 round, the Index had *fallen* 4.5%. Yet Holcim *increased* its bid price for asphalt by 1.7%, or $97,500. F.O. Day, in contrast, *decreased* its 2024 bid price for asphalt by 9.9%, or $597,250. The Calvert County project thus rotated from Holcim to F.O. Day.

63.     Despite F.O. Day's frustration of Team Cam's 2022 Calvert County bid, Team Cam continued to grow. By mid-year, Team Cam was competing for and winning contracts in Districts 1, 2, 3, and 5. It employed up to approximately 130 employees, and it hired another paving and milling crew and spent an additional $1 million on equipment. Given its employee count, equipment, and bonding capacity, it was set up to achieve $40 million in revenue (absent the Defendants' conspiracy).

64.     Team Cam also continued its discussions with Holcim regarding the potential acquisition. During those discussions, Holcim requested competitively sensitive information from Team Cam for diligence purposes, which Mr. Blades provided, believing a deal was near. He even contracted to provide Team Cam crews to complete work for Holcim on the Charles and St. Mary's projects. At that point, Holcim held the existing contracts for those projects, which were coming up for re-bidding. Holcim was having difficulty performing the contracts, which could have disqualified it from competing for the new round of bidding. In response to a request from Holcim, and believing a deal was imminent, Team Cam provided crews to complete the work in Charles and St. Mary's Counties in June 2022. But after the work was done, Holcim informed Team Cam that it would proceed no further with acquisition negotiations. Holcim also refused to pay approximately $170,000 that was owed to Team Cam for the work done on the Charles and St. Mary's contracts.

65.     By mid-2022, Team Cam was establishing itself as a rapidly emerging paving contractor in Districts 1, 2, 3, and 5, but the conspirators continued to dominate in those districts. Publicly available bid data shows that there were 29 SHA projects in the geographic market in 2022. Team Cam was the apparent low bidder on five of those contracts, accounting for nearly $11 million in state paving projects. Allan Myers, Bramble, F.O. Day, and Reliable, on the other

hand, collectively won 23 of the bids, totaling nearly $150 million in contracts or 91.3% of the total.

**2022 SHA Lettings in Districts 1, 2, 3 & 5 – Apparent Low Bidders**

| Contractor (**bold** = conspirator) | Bids Won | Total (millions) | Share |
|---|---|---|---|
| **Allan Myers** | 8 | $62.3 | 38% |
| **F.O. Day** | 7 | $44.9 | 27.4% |
| **Bramble** | 6 | $29.3 | 17.9% |
| **Reliable** | 2 | $13.0 | 7.9% |
| Team Cam | 5 | $11.0 | 6.7% |
| Others | 1 | $3.4 | 2.1% |

### D. THE CONSPIRATORS IMPOSE EXTRACTIONARY PRICE TERMS ON TEAM CAM

66.     Shortly after Holcim terminated acquisition discussions, Team Cam began facing problems with another rival supplier, Bramble. Bramble was the overwhelmingly dominant heavy highway paving contractor in the southern half of District 2, on the other side of Chesapeake Bay. Team Cam had begun competing in "Bramble Country" in mid-2021 when it won an SHA patching project in Talbot County. The contract had been awarded to Bramble in previous rounds, but Team Cam bid more than 10% less than Bramble and won the contract.

67.     Bramble nevertheless stood to profit from the Talbot County patching contract, as it had agreed to supply Team Cam with asphalt for the project. Bramble, however, demanded unusual new terms in its supply agreement. Instead of having a floating price, Bramble quoted Team Cam a fixed price and demanded a pass-through of all price adjustments Team Cam received from the state for diesel fuel, asphalt binder, and asphalt mixture.

68.     Team Cam rejected Bramble's demand for the pass-through. While Bramble offered a fixed price for asphalt, the price adjustments did not exist solely to offset shifts in the costs incurred by the asphalt *supplier*. For example, the diesel fuel price adjustment not only accounted for the diesel-related costs of producing asphalt, but also for fuel used for hauling, spreading,

compacting, and finishing the base. Indeed, fuel costs are a much more significant cost component for contractors operating heavy equipment than it is for asphalt plant operators. There was thus no reason the supplier should get the entirety of any adjustment. Team Cam requested that Bramble follow the standard approach of simply charging a real-time price for asphalt (which would reflect the plant operator's shifting costs), and Team Cam, as the prime contractor, could then retain the price adjustments from SHA.

69.     Bramble rejected Team Cam's request and refused to sell the company asphalt. Bramble's president, Paul Bramble, emailed Mr. Blades on July 28, 2021, saying: "Buy your mix from Allan Myers." Mr. Blades responded, asking for clarification: "Are you saying that you wont sell [us] asphalt anymore, even if we agree to your terms?" Mr. Bramble never responded.

70.     By mid-2022, however, it appeared that Bramble had changed its tune. In January of that year, Team Cam won its first major contract in District 2 for a resurfacing project in Talbot County. Like the earlier patching job, the new project was also in the middle of "Bramble Country." Bramble reached out to Team Cam claiming that the SHA had requested asphalt samples for the project, suggesting Team Cam had identified Bramble as the supplier for its bid. Team Cam informed Bramble that it had not identified Bramble due to the previous year's dispute over the pass-through provisions. Bramble struck a conciliatory tone and pledged not to seek Team Cam's price adjustments, so Team Cam agreed to solicit a quote.

71.     Bramble submitted a quote for asphalt to Team Cam on May 9, 2022. But when Team Cam reviewed the quote, it noted that the contract language still included the pass-through provision. Again, Team Cam rejected the pass-through provision and refused to sign the agreement.

72.     Even without a signed agreement in place, however, Team Cam began to purchase quantities of asphalt from one of Bramble's plants on June 17, 2022. Team Cam continued to

19

source asphalt from the Bramble plant, but during that time Bramble engaged in systematic disruption that was designed to frustrate Team Cam's ability to execute on the project. Bramble refused to accept orders for asphalt in advance, repeatedly delayed filling Team Cam's orders while "recalibrating" its scales, and then told Team Cam that a critical piece of equipment was "tied up" on another project. Finally, Team Cam was forced to obtain asphalt from a different supplier, Allan Myers, at up to 14.5% higher prices.

73. As Team Cam's dispute with Bramble escalated, Team Cam suddenly began facing problems with its other rival suppliers. On October 5, 2022, a Team Cam project manager received a mysterious email from a technician at Allan Myers. Team Cam was set to begin a paving contract in Anne Arundel County, for which it was sourcing asphalt from Allan Myers' plant in Jessup, Maryland. The email stated: "If you would like for me to track the Mix, Density, AC and Fuel Pay Adjustments for you just let me know before you start working on any of the locations on your XX1715577 contract." The email was mysterious because the price adjustments were wholly irrelevant to Team Cam's contract with Allan Myers for that project. Allan Myers' quote for that project followed the floating price pattern described above. There was thus no reason for Allan Myers to be tracking the state price adjustments, which would have no bearing on the price Team Cam paid Allan Myers for asphalt. And Allan Myers had never previously offered to track the price adjustments.

74. In early October 2022, Team Cam received an invoice from Bramble for asphalt for the Talbot County surface paving project. The invoice included a charge for the pass-through of fuel and binder price adjustments from the state. Team Cam objected on October 14, 2022 that it had never agreed to pay any such pass-through and had refused to sign the agreement containing the pass-through.

75. On October 17, 2022, Mr. Bramble responded in an email to Mr. Blades. He first claimed that Bramble's rival asphalt supplier, Allan Myers, also required the pass-through. That was untrue, as Allan Myers had never previously billed Team Cam for any price adjustment pass-through. But it did explain Allan Myers' email earlier that month spontaneously offering to track the price adjustments.

76. Mr. Bramble then went on to state that "Colleagues at Reliable Contrating [sic] confirmed they charge you for the adjustments, and bill for the bonus/penalty due for the mix from the plant," referring to the state mix incentive. Again, Bramble was admitting to coordinating with its competitors regarding the price terms they would demand of Team Cam. But Mr. Bramble's claim that Reliable was already charging the pass-through was inaccurate. Reliable had never charged for any price adjustments or incentives, and its contract terms did not provide for any such pass-through. However, that would shortly change.

77. Just two weeks after Mr. Bramble admitted that he had discussed the pass-through with "colleagues at Reliable," Reliable suddenly began demanding pass-through of price incentives from Team Cam. At the time, Team Cam was working on a project in Annapolis, Maryland. Reliable was supplying Team Cam asphalt from its Waugh Chapel plant in Gambrills, Maryland. The quote mirrored Reliable's prior quotes and included the normal floating price terms: "Prices based on the AC index of $661.67…. These prices are not guaranteed and may fluctuate with the price of liquid asphalt." However, in an email on November 1, 2022, Reliable's sales manager added a new price term: "[J]ust in case you aren't [aware] and there are no surprises down the road. The state mix incentives that come with this job are to go to Reliable Contracting."

78. Immediately after Team Cam received that email, Mr. Blades called Reliable's COO, Rob Scrivener. Mr. Blades asked Mr. Scrivener whether Reliable was now demanding the

21

incentive because he had been speaking with Bramble. Mr. Scrivener denied the accusation, but he then admitted that he "had heard from the Association" that Reliable should be demanding the pass-through. Mr. Scrivener was referring to the MAA, a trade group representing Maryland asphalt suppliers. As of early 2022, Mr. Scrivner was the chairman of the MAA, while Paul Bramble and his sister, Megan Owings, were directors. Francis Day, IV, the president of F.O. Day, was a director of the MAA as well. Later, after Team Cam was destroyed and Mr. Blades was forced to work for Reliable, Mr. Scrivener would admit to having discussed Team Cam and the pass-through of price adjustments and incentives with Paul Bramble over beers at an MAA meeting.

79.     During the November 1, 2022 call, Mr. Scrivener also made it clear that Reliable was not seeking only the asphalt mix incentive mentioned in the email, but also the price adjustments for fuel and binder—despite the fact that Reliable's quote still included a floating price provision. That would have meant Reliable would be double-compensated for any price increase between the quote date and performance. But Reliable would later agree to drop the demand for the price adjustments when it became clear that the Maryland Asphalt Index was *decreasing*, which would have meant Reliable actually would have *owed* Team Cam for the decrease.

80.     Reliable's demand for the pass-through was a sudden, major, and unexplained departure from its prior course of dealing with Team Cam. Reliable had never previously demanded the pass-through of mix incentives or any other state price adjustments or incentives.

81.     Reliable's demand for the state mix incentives was not only new—it was unreasonable. The mix incentive is a financial incentive provided to contractors to encourage the placement of superior quality asphalt mixtures. This incentive aims to promote long-lasting, durable pavement by ensuring that the contractor lays asphalt that meets or exceeds certain

22

predefined quality specifications. Importantly, responsibility for the quality of laid asphalt does not lie solely or even primarily with the asphalt plant operator. While the asphalt supplier must produce a mix that meets specified guidelines, the paving contractor is responsible for transporting the asphalt to the job site and maintaining the mix at a proper temperature to prevent premature cooling, which can affect workability and compaction. The contractor is also responsible for laying down and compacting the asphalt, which has a significant influence on the final quality and durability of the roadway. And the contractor is responsible for managing and adapting to environmental conditions such as temperature and humidity, which can affect the curing and settling of the asphalt. There is thus no reason the state's incentives should have gone to the asphalt supplier, and indeed MDOT's policy specifies that the incentives be paid to the contractor.

### E.   THE CONSPIRATORS BEGIN PRESSURING TEAM CAM'S SURETY

82.    Bramble quickly escalated its dispute with Team Cam, first by pressuring the SHA to withhold funds and then going after Team Cam's surety. By October 20, 2022, Mr. Blades learned that Bramble had filed a formal claim with SHA, asserting that it was owed the pass-through. Mr. Blades pointed out to SHA that Bramble was a supplier, and not a subcontractor, and it thus had no standing to demand SHA withhold payments to Team Cam.

83.    Unable to intercept Team Cam's SHA payments directly, Bramble then switched strategies and began going after Team Cam's surety. On November 15, 2022, Bramble filed a bond claim against Team Cam's surety, UFG. The claim alleged that Team Cam owed Bramble $674,269.06 for the asphalt and price adjustments. As discussed above, the ability to obtain bonding is a necessity for contractors hoping to compete for major state and county paving contracts. Team Cam had worked hard to build its reputation for quality and performance, for

among other reasons, to gain more bonding capacity from its surety. Attacking a firm's bonding company meant attacking its ability to compete in the state.

84.     On November 21, 2022, Mr. Blades learned that there was another bond claim against Team Cam, this one from Midlantic for $66,475.50. Midlantic was a road-striping contractor, and Team Cam had hired it as a subcontractor for a project in May 2022. However, Midlantic had failed to complete work on the contract, and Team Cam was forced to hire a different subcontractor at considerable expense. Midlantic nevertheless filed a bond claim on October 28, 2022—after the dispute with Bramble had escalated and Bramble had filed a complaint to SHA.

85.     Confused as to why Midlantic was filing a spurious bond claim, Mr. Blades reached out to Midlantic's president, John F. Deeley. Mr. Deeley would only communicate with Team Cam by phone and refused to respond to emails. During a telephone conversation immediately after learning of the bond claim, Mr. Blades asked Mr. Deely why his company was filing its bond claim. Mr. Deeley responded that those in the industry "stick together," and he said that a supplier friend had said "it would be beneficial" for Midlantic to assert the bond claim. Mr. Blades interpreted this to be a reference to Bramble or Reliable, which were the only suppliers then in a dispute with Team Cam. Mr. Deeley also told Mr. Blades that "folks in the industry say that they won't even sell you asphalt if you had cash."

86.     Midlantic's bond claim proved to be unsuccessful. UFG denied it outright on February 21, 2023 because "Midlantic removed the materials for which it is claiming payment, and such material were furnished by another supplier at an increased cost, Midlantic is not due payment." But it proved there was a coordinated campaign to pressure UFG to terminate its relationship with Team Cam and, ultimately, to force Team Cam out of business.

24

87.     By January 2023, that coordinated campaign against Team Cam had begun to achieve success. While continuing to reject Bramble's claim, Team Cam nevertheless attempted to settle Bramble's bond claim. But Bramble refused, stating: "We won't be signing this. We are owed liquid hma adjustment, and plant mix incentive." On January 24, 2023, UFG informed Team Cam that it would issue no further bonds until Bramble's allegations were resolved. By refusing to extend Team Cam's bonding capacity, UFG effectively terminated the contractor's ability to compete for new MDOT/SHA paving contracts.

88.     But at that point, UFG's refusal to provide further bonding to Team Cam was indefinite—there was still hope that Team Cam could resolve the issues with Bramble and UFG would resume bonding. The other co-conspirators, however, continued to pile on to ensure that would not take place.

89.     On January 20, 2023, the day after UFG cut off future bonding, Holcim filed its own bond claim for $75,312.77 against Team Cam. As with Midlantic's bond claim, Holcim's bond claim made little sense. Holcim itself still owed approximately $170,000 to Team Cam for the work it had performed in Charles and St. Mary's Counties. Team Cam had sent a letter requesting payment from Holcim. Holcim's filing of the bond claim against Team Cam with UFG thus came as a shock to Mr. Blades. He wrote to UFG to explain that Holcim owed money to Team Cam, and he voiced his suspicion that Holcim was involved in an antitrust conspiracy with other rival suppliers to put Team Cam out of business.

90.     After Holcim filed its bond claim, one of its representatives reached out to Mr. Blades to discuss the amounts owed. Holcim proposed a solution whereby it would cancel the amount owed by Team Cam and issue Team Cam approximately $100,000 in credits against future

asphalt purchases. Holcim's representative went so far as to request that Team Cam not file a bond claim against its own surety, and Team Cam filed no such claim.

91.     On February 3, 2023, UFG sent a letter to Bramble. The letter explained that UFG was still investigating the bond claim, which was filed less than three months prior. It also noted that Team Cam had never signed the quote containing the pass-through language, and it raised various defenses, including a Statute of Frauds defense. The letter also mentioned that Team Cam had raised antitrust concerns due to the apparently coordinated action being taken against it.

92.     Bramble's general counsel, Megan Owings (née Bramble), responded to UFG in a heated, seven-page letter on February 15, 2023. She claimed to be "flabbergasted" UFG was still investigating the claim. She also rejected Team Cam's antitrust concerns as "frivolous" and "an effort to frighten Bramble." Finally, she threatened litigation.

93.     UFG responded on March 10, 2023, by issuing letters to both Bramble and Team Cam. The letter to Bramble expressed disappointment in Ms. Owings' "tone and unprofessional accusations and speculations." UFG stressed that its role was to investigate the claims independently, pointed out that the investigation was proceeding expeditiously, reiterated a request for Bramble to produce all documents supporting its claim, and explained the holes in Ms. Owing's legal reasoning.

94.     UFG's letter to Team Cam, on the other hand, demanded that Team Cam pay $725,000 as an indemnity against Bramble's $674,269.06 claim. The letter gave Team Cam one week to come up with the payment. It also demanded full access to "the books, records, and accounts of Team Cam."

**F.   THE  CONSPIRATORS  MAINTAIN  PRESSURE  ON  THE  SURETY  AND REFUSE TO DEAL WITH TEAM CAM**

95.      While Bramble and Holcim continued pressuring UFG, the other rival suppliers also began to pile on. By late March 2023, Allan Myers was also refusing asphalt to Team Cam. In response to an inquiry from Team Cam about an upcoming project, an Allan Myers sales manager responded on March 29, 2023: "I just got out of a conference call meeting that focused on this very issue. Unfortunately, I am being told that we need the unpaid balance cleared up prior to selling any more material." Two days later, on March 31, 2023, Team Cam had paid off the remaining balance and sent proof to Allan Myers, but Allan Myers continued to refuse selling asphalt to Team Cam.

96.      On the same day, the COO of Reliable, Mr. Scrivener, contacted Mr. Blades by phone. The apparent purpose of the call was to check whether the conspiracy to undermine Team Cam was working. Without prompting, he asked Mr. Blades, "Are you still able to bid?" The question surprised Mr. Blades because there was no reason for anyone at Reliable even to have known Team Cam was having issues getting bonding from UFG.

97.      At some point in the next few days, Allan Myers contacted UFG. Allan Myers had no pending or potential bond claim against Team Cam, as it confirmed in a later email on April 11, 2023. There was thus no reason for Allan Myers to contact Team Cam's surety. Indeed, as with Reliable, there was no reason for Allan Myers even to have known that Team Cam was having issues with its surety. The only reasonable explanation, one that is consistent with admissions by members of the conspiracy about their communications regarding Team Cam, is that it and Reliable (like Midlantic) had been told by the other suppliers who had filed bond claims, Bramble and/or Holcim. Nevertheless, despite having no legitimate reason to contact UFG, Allan Myers did so to inform the surety that Allan Myers would no longer supply asphalt to Team Cam. The

only purpose of this communication was to increase the pressure on UFG to abandon Team Cam. It worked.

98. Allan Myers' threat to withhold asphalt from Team Cam appears to have been the final straw for UFG. At that point, it had become clear that at least four of Team Cam's most important suppliers were intent on putting their paving contract competitor—an upstart company—out of business. Bramble was refusing to supply Team Cam, demanding unagreed-to price adjustments, and filing spurious bond claims. Holcim had filed its own spurious bond claims, and it likewise was refusing to supply Team Cam. Reliable was also refusing to supply Team Cam. And Allan Myers had spontaneously reached out to say that it would no longer supply asphalt to Team Cam. At that point, UFG's incentives seemed to shift from protecting Team Cam against frivolous bond claims to protecting itself from insurance claims after Team Cam inevitably failed.

99. On April 3, 2023, UFG issued at least 15 letters to MDOT. The letters stated that UFG "demands that Maryland Department of Transportation, State Highway Administration release no further funds" on Team Cam's projects without UFG's consent. In effect, UFG froze Team Cam's cash receivables, which accounted for approximately 90-95% of Team Cam's revenue, causing a catastrophic liquidity problem.

100. UFG did not even bother to copy Team Cam on the letters. Indeed, Team Cam only learned that UFG had frozen its cash receivables a week after the letters were sent, when the SHA director sent an email attaching the letters to Mr. Blades. As the SHA director noted in his email, UFG's failure to notify Team Cam of the drastic step was unusual: "I found it odd that you were not cc-d and that there was not direct contact information for [UFG representative] Mr. Blair Kipp." By this point, UFG had joined the conspiracy to eliminate Team Cam, however, reluctantly.

28

101. Despite UFG apparently having given up on the company, Team Cam nevertheless struggled to continue competing. Team Cam's tenacity apparently surprised its competitors. Reliable COO, Mr. Scrivener, again checked in to see whether the conspirators' plan to neutralize Team Cam was succeeding. On April 18, 2023, he had another telephone conversation with Mr. Blades. This time he asked Mr. Blades, "Are you still able to get material? Who is still supplying you?" Mr. Blades responded that Team Cam was still getting supply from M. Luis Construction ("M. Luis"). At the time, M. Luis, a small woman- and minority-owned asphalt manufacturer in Glen Burnie, Maryland, was Team Cam's last remaining supplier.

102. When Mr. Blades told that to Mr. Scrivener, the Reliable COO laughed. He informed Mr. Blades that Reliable owned the M. Luis plant and merely leased it to M. Luis. He then said that Reliable "might take possession of the plant," quipping that "they," referring to M. Luis, "have not been maintaining it." Mr. Scrivener's clear purpose was to remind Mr. Blades that Team Cam's last remaining supplier was under Reliable's thumb and could not be relied upon.

103. Again, Mr. Blades refused to give up and instead sought out additional suppliers for Team Cam. In late April, Team Cam again reached out to F.O. Day, which had previously supplied Team Cam on numerous occasions. Team Cam had not sourced asphalt from F.O. Day since mid-2022, but Mr. Blades still hoped F.O. Day would be a viable supply source. But by April 20, 2023, F.O. Day was also refusing to sell to Team Cam unless the company pre-paid, which was not a viable option given Team Cam's liquidity situation. Mr. Blades emailed Team Cam's account representative to F.O. Day to ask why it had imposed this new policy on Team Cam: "We used to buy thousands of tons from Day and we never 'not paid' or had to pay on a cash account…. This is such a small order and we are required to pre pay with credit card and or pick up a check in the morning? Keeping this between us, I am just curious as to what changed?"

104.    Mr. Blades followed up by calling Mike Day, F.O. Day's vice president. By that point, Mr. Day ran his company's asphalt operations. Mr. Day admitted to Mr. Blades, "I heard we should not be selling you asphalt anymore." Because Mr. Day was the top decision-maker at F.O. Day, it was clear that whoever was telling him not to supply Team Cam any more was not somebody from within F.O. Day. Moreover, Francis Day IV was a director on the MAA with other conspirators at the time.

105.    For each of the conspirators, the decision in late 2022 through early 2023 to cease supplying Team Cam marked a sudden reversal of a long-standing course of dealing. Previously, it had never been in the economic interests of any individual defendant to refuse supply to Team Cam. Even when one of them lost a state or county bid to Team Cam, supplying the asphalt offered a second opportunity to profit from the project. Unilaterally refusing to supply Team Cam would have meant missing out on that opportunity with little upside because the resulting harm to Team Cam would not have been enough to drive it from the individual defendant's market. Bramble's unilateral refusal to supply Team Cam in 2021 proved this dynamic—although Team Cam had to source asphalt from a more distant (and thus costlier) supplier, it remained a strong competitor.

106.    But if each defendant knew the others would also refuse to deal with Team Cam, their calculus changed. Each would forego some profits from asphalt sales in the short-term. But they could also hope to drive Team Cam out of the market—especially when the collective refusal was coupled with the coordinated pressure on Team Cam's surety. Then each defendant could recoup its lost profits through the lessened competition in its own territory. That is exactly what happened.

### G. UFG FORCES TEAM CAM TO SELL ITS ASSETS TO RELIABLE AND TO SIGN A RELEASE AGAINST BRAMBLE

107.    By May 2023, Mr. Blades recognized that there was no path forward for Team Cam. Team Cam's surety, UFG, had frozen the company's cash receivables, making it difficult for Team Cam to make payroll and its other obligations. The SHA Director even acknowledged the effect this was having on Team Cam in an April 27, 2023 email following up on an earlier meeting with both UFG and Team Cam: "Currently, we are still operating under the request in the UFG letters to hold payment until told otherwise. During the meeting, it appeared that all acknowledged that holding payments would create additional cash flow issues."

108.    UFG was also refusing to issue Team Cam new bonding capacity, meaning that it could no longer compete for SHA contracts. Moreover, even if Team Cam could get bonding capacity, the Defendants were now refusing to sell Team Cam the asphalt necessary to perform. Mr. Blades began to believe he had no choice but to sell his company.

109.    Mr. Blades hired an investment bank, SC&H Group, Inc. ("SC&H") to begin looking for potential acquirers in February 2023, but he held out hope of remaining independent. However, on May 6, 2023, a representative from UFG, Blair Kipp, called Mr. Blades to harangue him into selling the business. Mr. Kipp warned Mr. Blades that if he refused to sell the company, then his wife's family property would be imperiled, and even his children's financial security would be at risk.

110.    By Spring 2023, Reliable had emerged as the most likely purchaser of Team Cam's assets. Though Team Cam's assets—including its trucks, equipment, crews, and existing contracts—should have been attractive to the other Defendants as well, they all refused to submit an offer.

31

111.    UFG began preparing an agreement for Team Cam to sell virtually all its assets to Reliable for approximately $3 million. The purchase price was less than half of what Holcim had offered in early 2022 and pennies on the dollar compared to what Team Cam would have been worth by mid-2023, absent the Defendants' conspiracy.

112.    Before finalizing the sale to Reliable, UFG used its power over Team Cam to compel it to release its antitrust claims against Bramble. By this point, UFG had bowed to the pressure from the conspiring Rival-Supplier Defendants and Bramble. While claiming to be acting as Team Cam's "attorney-in-fact," and thus owing a fiduciary duty to Team Cam, UFG signed a release on Team Cam's behalf of all antitrust claims against Bramble. Then UFG pressured Mr. Blades to add his own signature to the release.

113.    Finally, Mr. Blades signed the Asset Purchase Agreement with Reliable on July 24, 2023. He then signed an agreement novating all of Team Cam's existing contracts to Reliable. With these agreements, Team Cam ceased competing in the heavy highway paving markets in eastern Maryland.

114.    As part of its acquisition of Team Cam, Reliable also hired many Team Cam employees, including Mr. Blades. Reliable offered Mr. Blades a job as a Division Manager, and he was to report to Reliable's COO, Mr. Scrivener. Reliable ensured that his duties would exclude anything having to do with state heavy highway contracts. Mr. Blades accepted the employment contract to help ensure that his former employees would have a smooth transition to Reliable.

115.    On his first day of work, Mr. Blades realized that his hiring was not meant to aid with the transition, but rather to humiliate him. As he walked into the Reliable office, he was called into a conference room. Mr. Scrivener and Reliable CEO Jay Baldwin were in the room. Mr.

Scrivener then put a Reliable hat on Mr. Blades' head and took a photograph, laughing. He then appeared to text the picture to unknown third parties.

### H.  RELEVANT MARKETS AND MARKET POWER

116.    Defendants' conduct at issue in this Complaint implicates two relevant antitrust product markets in eastern Maryland: (1) the market for the supply of asphalt for state and county highway paving (the "Asphalt Supply Market") and (2) the market for state and county highway asphalt paving contracting (the "Contracting Market").

117.    Eastern Maryland, defined as SHA Access Management Districts 1, 2, 3, and 5, is a relevant geographic market (the "Market Area") for both the contracting and asphalt supply markets. Market participants recognize the Market Area as a relevant geographic market. For the Asphalt Supply Market, the geographic scope of competition is limited due to high transportation costs and the limited shelf life of asphalt. Asphalt suppliers more than 30-60 minutes away from a project site generally are not viable substitutes for more nearby contractors.

118.    For the Contracting Market, the geographic scope of competition is limited because the Asphalt Supply Market is limited, and contractors must have relationships with local asphalt suppliers to compete in a territory. Most Maryland asphalt paving contractors rely wholly or predominately on their own asphalt plants, and they thus remain within their own territories. Though some degree of cross-supply occasionally takes place (*e.g.*, Holcim may supply F.O. Day for a project), Team Cam was the only major asphalt paving contractor in the Market Area that regularly sourced asphalt from non-owned-and-operated plants. That is what allowed Team Cam to compete across districts rather than remaining within one territory.

119.    Rival-Supplier Defendants and co-conspirator Bramble collectively exercise dominant market power in the Asphalt Supply Market within the Market Area. There are only 19

asphalt plants within the Market Area, and the conspirators operate 13 of them (68.4%). Of the remaining six plants, two are operated by M. Luis, but Reliable owns the M. Luis plant in Anne Arundel County and Holcim owns the M. Luis plant in Montgomery County. Given that Reliable's COO threatened to revoke M. Luis's lease to prevent it from supplying Team Cam, the M. Luis plants should be considered within conspirators' market power as well. Rival-Supplier Defendants and Bramble thus control 15 of 19 asphalt plants in the Market Area, or 78.9%.

**Eastern Maryland Asphalt Supply Plants**

| SHA District | County | Plant Operator (bold = conspirator) | Plant Location |
|---|---|---|---|
| 1 | Worcester | **Allan A. Myers** | 10031 Kepler Ln. Bishopville, MD 21813 |
| | Wicomico | **Allan A. Myers** | 8788 Patton Rd. Delmar, MD 21875 |
| | Dorchester | Russell Paving Co. Inc. | 3960 Red Hill Rd. East New Market, MD 21631 |
| 2 | Talbot | **David A. Bramble, Inc.** | 40694 Grange Hall Rd. Wye Mills, MD 21679 |
| | Kent | **David A. Bramble, Inc.** | 32559 Bramble Way Massey, MD 21650 |
| | Cecil | **Allan A. Myers** | 284 Quarry Rd. Elkton, MD 21921 |
| | | Principio Asphalt | 1079 Belvidere Rd. Port Deposit, MD 21904 |
| 3 | Prince George's | Laurel Sand and Gravel | 5401 Van Dusen Rd. Laurel, MD 20707 |
| | | **Aggregate Industries** | 2820 52nd Ave. Hyattsville, MD 20781 |
| | | **Francis O. Day Company, Inc.** | 8700 D'Arcy Rd. Forestville, MD 20747 |
| | | **Aggregate Industries** | 5401 Kirby Rd. Clinton, MD 20735 |
| | Montgomery | **M. Luis Construction Co. Inc.** | 14811 Southlawn Lane Rockville, MD 20850 |
| | | **Francis O. Day Company** | 13900 Piney Meetinghouse Rd. Rockville, MD 20850 |
| 5 | Anne Arundel | **M. Luis Products** | 101 Dover Road NE Glen Burnie, MD 21060 |
| | | **Aggregate Industries** | 1320 Cunningham Rd. Severn, MD 21144 |
| | | **Reliable Contracting Co., Inc** | 2541 Brickhead Rd. Gambrills, MD 21054 |
| | Charles | **Aggregate Industries** | 12205 Billingsley Rd. Waldorf, MD 20601 |

| | **Francis O. Day Company** | 12300 Billingsley Rd. Waldorf, MD 20602 |
|---|---|---|
| St. Mary's | C.A. Bean Asphalt | 29056 Three Notch Rd. Mechanicsville, MD 20659 |

120. There is also direct evidence of the conspirators' dominant market power in the Asphalt Supply Market in the Market Area. Once the conspirators collectively refused to supply Team Cam, Team Cam quickly became unable to compete and ceased operating. The fact that Team Cam could find no economically viable substitute for an essential input proves the conspirators collectively exercised dominance or even monopoly power.

## V. ANTICOMPETITIVE EFFECTS

121. Defendants and Bramble's conspiracy removed a dynamic, growing competitor from the Contracting Market in the Market Area. Absent the conspiracy, Team Cam would have remained a viable competitor that offered lower prices and higher quality services to state and county agencies. As a result of the concerted efforts of the conspirators to eliminate competition, Team Cam suffered catastrophic losses. Team Cam's revenue was approximately $16.3 million in 2021 and $16.5 million in 2022 for an enterprise value of at least $40 million (absent the Defendants' conspiracy), which was wiped out by the Defendants' anticompetitive actions.

122. Moreover, as a result of the conspiracy, fewer bidders are competing for state and local contracts in the Contracting Market in the Market Area, even as the federal government has allocated an additional $4.6 billion in new funding for Maryland highways and bridges over the next half decade.[1] This reduces the market pressure on the conspirators to lower their prices or improve their quality. Instead, they can charge higher prices than they would under competitive conditions, knowing that contracting agencies have limited alternatives. Contracting agencies are

---

[1] United States Department of Transportation, Press Release: The Bipartisan Infrastructure Law Will Deliver for Maryland, https://www.transportation.gov/sites/dot.gov/files/2021-11/Bipartisan_Infrastructure_Law_Maryland.pdf.

forced to pay higher prices for paving contracts because they have no choice but to accept the bids offered by the conspirators or face delays and disruptions in their infrastructure projects.

123.    Ultimately, it is Maryland residents and federal taxpayers who will suffer from the reduced competition. Less competition among paving contractors means more tax dollars spent on infrastructure, more inconvenience and delays, reduced road quality, higher maintenance costs, and lower safety standards. Meanwhile, the conspirators will profit even more from taxpayer dollars in their respective territories.

## CAUSES OF ACTION

### COUNT I
### Conspiracy to Eliminate Plaintiff as a Competitor in the
### Asphalt Paving Market in the Market Area
### in Violation of Sherman Act Section 1, 15 U.S.C. § 1
### and the Maryland Antitrust Act

124.    Team Cam incorporates by reference all preceding paragraphs and the allegations contained therein.

125.    Rival-Supplier Defendants and co-conspirator Bramble are direct horizontal competitors in the Asphalt Paving Market.

126.    Rival-Supplier Defendants and co-conspirator Bramble are direct horizontal competitors in the Asphalt Supply Market.

127.    Defendant MAA is a trade association controlled by Rival-Supplier Defendants, and it participates in coordinating their activities.

128.    Defendant Midlantic is a subcontractor that provides striping services for prime contractors competing in the Asphalt Paving Market.

129.    Team Cam was a competitor of Rival-Supplier Defendants in the Asphalt Paving Market and a customer of Rival-Supplier Defendants in the Asphalt Supply Market. Team Cam was a customer of Defendant Midlantic.

36

130. Since at least 2022, Defendants and co-conspirator Bramble have conspired, combined, and acted in concert to eliminate Team Cam as a competitor in the Asphalt Paving Market in the Market Area. The means and methods Defendants and Bramble used to exclude Team Cam included, among other things: (a) collectively refusing to sell asphalt to Team Cam or imposing such onerous terms as to make such purchases economically unfeasible; (b) imposing extractive price terms on Team Cam in the form of provisions requiring the pass-through of state price adjustments and incentives; and (c) pressuring UFG to: (i) refuse to provide additional bonding capacity to Team Cam; (ii) freeze Team Cam's cash receivables from SHA contracts; (iii) compel Team Cam to sign a release of antitrust claims against Bramble; and (iv) compel Team Cam to sell nearly all its assets to Defendant Reliable.

131. Defendants' conduct toward Team Cam has been uniform and interdependent, and Defendants demonstrated knowledge of each other's refusal to sell to Team Cam and other actions taken against Team Cam. Defendants' conduct has not been consistent with their independent self-interests or supported by legitimate business justifications. Defendants (a) admitted to discussing their business dealings with Team Cam with each other; (b) demonstrated knowledge of each other's refusal to deal and other actions taken against Team Cam; (c) have acted identically and contemporaneously in refusing to deal and other actions taken against Team Cam; (d) have altered their prior course of dealing in refusing to deal with Team Cam; and (e) offered pretextual justifications for their actions taken against Team Cam:

132. Defendants' illegal activities have operated in or within the flow of interstate commerce or have significantly affected interstate commerce.

133. The Defendants' conspiracy, combination, and concerted actions to refuse to deal with Team Cam and other actions taken against Team Cam in restraint of trade constitute a *per se*

violation of Section 1 of the Sherman Act (15. U.S.C. § 1) and the Maryland Antitrust Act (Com. Law II §§11-204).

134. As a result of the foregoing illegal conduct by Defendants, Team Cam has been injured in its business and property within the meaning of 15 U.S.C. § 4. As a direct and proximate result of Rival-Supplier Defendants' illegal conduct, Team Cam has been economically damaged in its business, and it sustained and will continue to sustain damages including consequential damages, out-of-pocket expenses, lost profits, and damage to its reputation, good will, and standing in the industry in an amount not presently known, but in no event less than $40,000,000.

135. Defendants and co-conspirator Bramble's conspiracy to eliminate Team Cam was a *per se* violation of Section 1 of the Sherman Antitrust Act. Even if the misconduct were found not to be a *per se* violation—and it should be—the conspiracy is unlawful under the rule of reason. Defendants' activities unreasonably restrained trade in the contracting market in the Market Area and affected interstate commerce.

WHEREFORE, Team Cam requests that this Court enter judgment against Defendants, jointly and severally, in such amount as the evidence shall show, but in no event less than $40,000,000 in actual damages, which amount should be trebled pursuant to 15 U.S.C. § 15, award reasonable attorneys' fees and costs and interest, and provide such other and further relief as this Court deems just and proper.

**COUNT II**
**Conspiracy to Fix Price Terms for the Sale of Asphalt**
**in Violation of Sherman Act Section 1, 15 U.S.C. § 1**
**and the Maryland Antitrust Act**

136. Team Cam incorporates by reference all preceding paragraphs and the allegations contained therein.

137.   Rival-Supplier Defendants and co-conspirator Bramble are direct horizontal competitors in the Asphalt Supply Market. Team Cam is a customer of Rival-Supplier Defendants in that market.

138.   Defendant MAA is a trade association controlled by Rival-Supplier Defendants, and it participates in coordinating their activities.

139.   Defendant Midlantic is a subcontractor that provides striping services for prime contractors competing in the Asphalt Paving Market.

140.   Since at least October 2022, Defendants and co-conspirator Bramble have conspired, combined, and acted in concert to impose extractive price terms on Team Cam in the form of provisions requiring the pass-through of state price adjustments and incentives.

141.   Co-conspirator Bramble attempted to impose a pass-through provision on Team Cam, then it sought to enforce the pass-through provision through Team Cam's surety, UFG.

142.   Co-conspirator Bramble admitted to discussing its demand for a pass-through with Defendants Reliable and Allan Myers. Defendant Reliable acted identically and contemporaneously as co-conspirator Bramble in suddenly demanding a similar pass-through in November 2022. Defendant Reliable also admitted to being instructed to demand the pass-through by MAA.

143.   Defendants' illegal activities have operated in or within the flow of interstate commerce or have significantly affected interstate commerce.

144.   Defendants' conspiracy to fix a pricing term in the sale of asphalt constitutes a *per se* violation of Section 1 of the Sherman Act (15. U.S.C. § 1) and the Maryland Antitrust Act (Com. Law II §§11-204).

39

145.    As a result of the foregoing illegal conduct by Defendants, Team Cam has been injured in its business and property within the meaning of 15 U.S.C. § 4. As a direct and proximate result of Defendants' illegal conduct, Team Cam has been economically damaged in its business and it sustained and will continue to sustain damages including consequential damages, out-of-pocket expenses, lost profits, and damage to its reputation, good will, and standing in the industry in an amount not presently known, but in no event less than $40,000,000.

WHEREFORE, Team Cam requests that this Court enter judgment against Defendants jointly and severally, in such amount as the evidence shall show, but in no event less than $40,000,000 in actual damages, which amount should be trebled pursuant to 15 U.S.C. § 15, award reasonable attorneys' fees and costs and interest, and provide such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38, Team Cam hereby demands that this matter be tried before a jury.

Dated:  May 28, 2024

Respectfully submitted,

/s/ Brandon C. Kressin
KRESSIN MEADOR POWERS LLC
Brandon C. Kressin, Esq. (31109)
Richard A. Powers, Esq. (*pro hac vice forthcoming*)
Mark Meador, Esq. (*pro hac vice forthcoming*)
300 New Jersey Avenue NW, Suite 900
Washington, DC 20001
Telephone: (202) 464-2905
Fax: (202) 998-9319
Email: brandon@kressinmeador.com
Email: richard@kressinmeador.com
Email: mark@kressinmeador.com