## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

TEAM CAM, LLC,

        Plaintiff,

v.

RELIABLE CONTRACTING COMPANY,
INC.,
FRANCIS O. DAY CO., INC.,
ALLAN MYERS MD, INC.,
HOLCIM-MAR, INC.,
*d/b/a Aggregate Industries*,
MIDLANTIC MARKING, INC. and
THE MARYLAND ASPHALT
ASSOCIATION, INC.,

        Defendants.

Civil Action No. 24-1545-TDC

## MEMORANDUM OPINION

Plaintiff Team Cam, LLC ("Team Cam") has filed a civil action against Defendants Reliable Contracting Company, Inc., Francis O. Day Co., Inc., Allan Myers MD, Inc., Holcim-Mar, Inc., Midlantic Marking, Inc., and the Maryland Asphalt Association, Inc., in which it alleges violations of the Sherman Act, 15 U.S.C. §§ 1–7, and of the Maryland Antitrust Act, Md. Code Ann., Com. Law §§ 11-201 to 11-213 (LexisNexis 2013). Defendants have filed a Motion to Dismiss, which is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

In the Complaint, Team Cam alleges the following relevant facts, which the Court accepts as true for the purposes of the resolution of the Motion.

### I.      The Eastern Maryland Paving Market

Team Cam, a limited liability corporation led by its founder and president, Ryan Blades, was in the business of paving highways and roads and entered the highway paving market in eastern Maryland in 2019. In Maryland, the paving of state highways is conducted by companies pursuant to paving contracts administered by the State Highway Administration ("SHA"), an agency within the Maryland Department of Transportation ("MDOT"). Each county government administers paving contracts for smaller roads within its jurisdiction. The SHA has divided Maryland into seven geographical administrative districts, with each district containing two to five counties. Districts 1, 2, 3, and 5, which include 15 counties in eastern Maryland (collectively, "the Eastern Maryland Paving Market"), are at issue in this case.

Generally, the SHA and county governments award paving contracts to the company that has submitted "the lowest responsive and responsible bid," meaning the one that offers the lowest price while also meeting the contract's requirements and specifications. Compl. ¶ 30, ECF No. 1. To perform a paving contract, a contractor must obtain asphalt, consisting of "a mixture of aggregates (such as sand, gravel, and crushed stone), asphalt cement (a petroleum product that acts as a binder), and additives (such as polymers, fibers, or modifiers)." *Id.* ¶ 31. Asphalt is manufactured in a production plant and stored there until it is transported in trucks to the project site. Contractors typically use asphalt from plants located 30 to 60 minutes away from the project site both because asphalt must maintain a certain minimum temperature during transport and because transportation fuel costs are a "significant factor in the overall cost of a project." *Id.* ¶ 40.

2

As a result, and where each SHA district has only a few asphalt plants, usually owned by one or two "dominant contractors," competition in the highway paving market is "constrained geographically." *Id.* ¶¶ 33-34.

In awarding a paving contract, the relevant state and county governmental agencies provide "price adjustments," through which an agency agrees to "pay more or less than a contractor originally bid to offset fluctuations in certain input costs," particularly the costs of diesel fuel and of the liquid that binds asphalt, known as "asphalt binder." *Id.* ¶¶ 47-48. The price of diesel fuel has a significant impact on the overall cost to the contractor because it mirrors the price of crude oil, which is used to make asphalt cement, and because diesel fuel is used to heat the asphalt during production and transport and is used by trucks conducting transport. Paving contracts also typically include certain "price incentives" to the contractor for asphalt mixture design and pavement density and compaction, which "reward (or punish) contractors for the quality of their performance." *Id.* ¶ 49.

For paving projects of a sufficient size, a contractor must be bonded, meaning that it must obtain bonding insurance from a surety, which covers losses to other parties if the contractor fails to complete the project properly or fails to pay subcontractors and suppliers. A contractor's ability to compete for larger contracts depends on its "bonding capacity"—the maximum amount of insurance provided by the surety—which a surety determines based on the contractor's "financial strength, reputation, and track record." *Id.* ¶ 29.

## II.   Team Cam

When Team Cam entered the Eastern Maryland Paving Market in 2019, the market was "highly concentrated" in that five paving contractors accounted for $88.8 million in contracts, or 97 percent of the total dollar value of the contract awards that year. *Id.* ¶ 38. Those five contractors

3

included Defendants Reliable Contracting Company, Inc. ("Reliable"), Francis O. Day Co., Inc. ("F.O. Day"), Allan Myers MD, Inc. ("Allan Myers"), and Holcim-Mar, Inc. ("Holcim") (collectively, "the Contractor Defendants"), as well as David A. Bramble, Inc. ("D.A. Bramble"), which is not a defendant in this case. These five companies operated their own asphalt plants and collectively operated 13 of the 19 asphalt plants in the Eastern Maryland Paving Market.

Because Team Cam did not have its own asphalt plant, it had to obtain asphalt from its rival paving contractors, including the Contractor Defendants and D.A. Bramble, which at times competed for the same paving contracts. If Team Cam was awarded a contract, such companies could still profit from the sale of asphalt to Team Cam. To put together a contract proposal, or bid, Team Cam solicited quotes from the asphalt suppliers with plants that were geographically close to the project site. The quotes typically stated that the asphalt prices were based on the then-current Maryland Asphalt Index and also specified that the quoted prices could "float in response to fluctuating input costs" such that Team Cam may have ended up paying higher prices to its asphalt supplier. *Id.* ¶ 42.

In December 2019, Team Cam won its first major paving contract and had $5.9 million in revenue that year. In 2020, United Fire Group Insurance ("UFG"), which served as Team Cam's surety, extended Team Cam's bonding capacity to up to $10 million of heavy highway contracts. That year, Team Cam won a large paving project in Anne Arundel County in SHA District 5, had $8.2 million in revenue, and reinvested $5 million in new equipment and employees. Then in 2021, Team Cam began winning asphalt paving projects in SHA Districts 1, 2, and 3, had revenue of $16.3 million, and secured approximately $30 million in contracts for 2022 and beyond.

## III.    The Alleged Conspiracy

As of 2022, Allan Myers, F.O. Day, Reliable, and D.A. Bramble accounted for $150 million in paving contract awards in the Eastern Maryland Paving Market, or 91.3 percent of the total dollar value of such contracts.  According to the Complaint, beginning that year, Defendants engaged in a conspiracy to drive Team Cam out of the Eastern Maryland Paving Market by (1) "sabotaging Team Cam's bids"; (2) "agree[ing] to impose the same extractive price terms on Team Cam [by] demanding that it pass along state price adjustments and incentives"; (3) "interfering with Team Cam's ability to get asphalt and perform its contracts"; (4) "harassing Team Cam's surety with a barrage of specious claims"; and (5) "outright refus[ing] to supply asphalt to Team Cam."  *Id.* ¶ 6.

### A.    The 2022 Calvert County Project

In April 2022, Team Cam submitted a bid for a paving project in Calvert County ("the Calvert County Project").  Earlier that same month, Holcim had given Team Cam "a non-binding 'Indication of Interest'" to purchase Team Cam for $10 million.  *Id.* ¶ 55.  To "avoid the appearance of impropriety," Team Cam did not seek quotes from Holcim for asphalt for the Calvert County Project and instead secured such quotes from F.O. Day.  *Id.* ¶ 56-57.

After submitting a bid using those quotes, Team Cam was preliminarily awarded the contract, outbidding Holcim and another company.  A Holcim representative then asked Team Cam where it had obtained its asphalt prices and was told that they came from F.O. Day.  However, when Team Cam subsequently sent the F.O. Day asphalt mix to Calvert County for approval, it was rejected for "failing to meet the project's specifications."  *Id.* ¶ 58.  When Blades asked about this failure to meet the specifications, an F.O. Day representative "pleaded ignorance" and stated that F.O. Day did not even produce the specified asphalt mix.  *Id.* ¶ 59.  With the rejection of Team

5

Cam's asphalt mix, Team Cam was disqualified, and Calvert County awarded the project to Holcim, the second-place bidder.

When Calvert County put the same project up for re-bidding one year later, in 2023, F.O. Day submitted a bid even though it had told Team Cam in 2022 that "it lacked the required asphalt mix." *Id.* ¶ 61. Holcim was awarded the project in 2023, but F.O. Day was awarded the same project in 2024. Notably, Holcim's asphalt prices in its 2024 bid were higher than in its 2023 bid, even though the Maryland Asphalt Index, which Holcim's asphalt prices had historically mirrored, declined from 2023 to 2024. F.O. Day's asphalt prices, however, declined from its 2023 bid to its 2024 bid. Based on these facts, Team Cam asserts that "[t]he Calvert County project thus rotated from Holcim to F.O. Day." *Id.* ¶ 62.

Meanwhile, after losing the 2022 Calvert County Project, Team Cam continued its acquisition discussions with Holcim. As a part of that process, in June 2022, Blades provided Holcim with Team Cam employees to assist Holcim with work on projects in Charles County and St. Mary's County. Upon completion of that work, however, Holcim ended the discussions about acquiring Team Cam and refused to pay Team Cam the approximately $170,000 that it owed Team Cam for its work assisting Holcim.

**B.    Demands for Price Adjustments and Incentives**

In mid-2021, Team Cam was awarded a contract for patching roads in Talbot County, in SHA District 2, that had previously been held by D.A. Bramble, the dominant highway paving company in that district. Although D.A. Bramble could still profit from the project because it had agreed to supply the asphalt to Team Cam, D.A. Bramble "demanded unusual new terms in its supply agreement." *Id.* ¶ 67. Specifically, D.A. Bramble imposed a fixed price for asphalt, instead of the typical floating price indexed to the Maryland Asphalt Index, and it required Team Cam to

6

pass through to D.A. Bramble all MDOT price adjustments for diesel fuel, asphalt binder, and asphalt mixture. Such price adjustments are typically provided to the paving contractor to offset price changes between the time of the bid and the time of the work, and the diesel adjustment in particular primarily offsets transportation costs paid by the paving contractor rather than the asphalt plant operator. When Team Cam objected to this unconventional pricing, Paul Bramble, D.A. Bramble's president, told Blades that he should purchase the asphalt from Allan Myers. When Blades asked if Bramble was "saying that you won't sell [us] asphalt anymore, even if we agree to your terms?", Bramble did not respond. *Id.* ¶ 69.

In mid-2022, Team Cam won its first major resurfacing contract in Talbot County ("the Talbot County Project"). Although in its bid Team Cam had not identified D.A. Bramble as its asphalt supplier, D.A. Bramble told Team Cam that the SHA had requested asphalt samples from Bramble for the project. Because D.A. Bramble "struck a conciliatory tone and pledged not to seek Team Cam's price adjustments," *id.* ¶ 70, Team Cam solicited a quote from D.A. Bramble but then declined to sign the proposed quote because it still included language demanding that Team Cam pass through the price adjustments. Nevertheless, in June 2022, Team Cam started sourcing asphalt from D.A. Bramble, only to have D.A. Bramble engage in "systematic disruption" of the project, including by refusing to accept orders in advance, delaying the filling of orders, and stating that a critical piece of equipment was "tied up" on another project. *Id.* ¶ 72.

Shortly thereafter, Team Cam began facing other requests to pass through price adjustments. On October 5, 2022, in relation to an Anne Arundel County project on which Allan Myers was supplying asphalt to Team Cam, an Allan Myers technician asked by email if Team Cam "would like for me to track the Mix, Density, AC and Fuel Pay Adjustments for you." *Id.* ¶ 73. Team Cam asserts that this email was "mysterious" because Allan Myers had not previously

7

asked Team Cam to pass through price adjustments and thus had no reason to track such data. *Id.*
¶ 73.

Also in early October 2022, D.A. Bramble sent Team Cam an invoice for the asphalt from
the Talbot County Project which included a charge for the pass-through of state price adjustments.
When Team Cam objected to the charge, Paul Bramble responded in an email to Blades that Allan
Myers also required the pass-through provision, and that "[c]olleagues at Reliable Contra[c]ting
confirmed they charge you for the adjustments, and bill for the bonus/penalty due for the mix from
the plant." *Id.* ¶ 76. According to Team Cam, neither Allan Myers nor Reliable had ever
previously imposed such pass-through provisions on Team Cam, but Paul Bramble's statement
explained Allan Myers' previous offer to track price adjustments.

Two weeks later, on November 1, 2022, Reliable began demanding, contrary to the terms
of its contract, a pass-through of price incentives in relation to a Team Cam project in Annapolis,
Maryland for which it was providing the asphalt. When Blades called Reliable's Chief Operating
Officer, Rob Scrivener, and asked if Reliable was now asking for pass-throughs because he had
spoken with D.A. Bramble, Scrivener denied having spoken to D.A. Bramble but then stated that
he "had heard from the Association" that Reliable should be demanding the pass-throughs, in
apparent reference to Defendant the Maryland Asphalt Association, Inc. ("the MAA"), the trade
association that represents Maryland asphalt suppliers. *Id.* ¶ 78. As of early 2022, Scrivener was
the MAA's chairman, and Paul Bramble, his sister, and Francis Day, IV, who was the president of
F.O. Day, were directors of the MAA. According to Team Cam, Scrivener later admitted that he
had discussed Team Cam and the pass-through of price adjustments and incentives with Paul
Bramble "over beers at an MAA meeting." *Id.* ¶ 78.

####     C.    **Bond Claims and Refusals to Supply Asphalt**

On November 15, 2022, D.A. Bramble filed a bond claim with UFG, Team Cam's surety, claiming that Team Cam owed D.A. Bramble over $674,000 for asphalt and price adjustments. On January 24, 2023, after D.A. Bramble refused to settle its bond claim, UFG told Team Cam that it would not issue Team Cam any more bonds until D.A. Bramble's claims were resolved, which effectively terminated Team Cam's ability to compete for new paving contracts.

Meanwhile, on November 21, 2022, Blades learned that Defendant Midlantic Marking, Inc. ("Midlantic"), a road-striping contractor, had also filed a bond claim of over $66,000 against Team Cam relating to its work in May 2022 as a subcontractor for Team Cam. Team Cam believed that the bond claim was "spurious" because Midlantic failed to complete that work. *Id.* ¶ 85. When Blades called Midlantic's president, John F. Deeley, to ask why Midlantic had filed it, Deeley stated that those in the industry "stick together," and that a supplier friend had told him that "it would be beneficial" for Midlantic to assert the claim. *Id.* Deeley also told Blades that "folks in the industry say that they won't even sell you asphalt if you had cash." *Id.* UFG ultimately denied Midlantic's bond claim in February 2023.

On January 20, 2023, Holcim also filed a bond claim against Team Cam for over $75,000, even though Holcim still owed Team Cam approximately $170,000 for Team Cam's work assisting Holcim on projects in Charles County and St. Mary's County. On March 10, 2023, after UFG and D.A. Bramble had exchanged letters regarding Bramble's bond claim, UFG sent a letter to Team Cam demanding that Team Cam pay $725,000 as an indemnity against D.A. Bramble's claim within one week and give UFG access to its books, records, and accounts.

On March 29, 2023, an Allan Myers representative told Team Cam, in relation to an upcoming project using Allan Myers' asphalt, that "we need the unpaid balance cleared up prior

9

to selling any more material." *Id.* ¶ 95. By March 31, 2023, Team Cam had paid off its balance and sent proof of payment to Allan Myers, but Allan Myers continued to refuse to sell asphalt to Team Cam. Also on March 31, 2023, Scrivener, on behalf of Reliable, called Blades and asked, without prompting, "Are you still able to bid?" *Id.* ¶ 96. According to Team Cam, at that point, there was no reason Reliable should have known about Team Cam's difficulties securing bonding from UFG. A few days later, Allan Myers, which had no potential bond claims against Team Cam, contacted UFG and stated that it would no longer supply asphalt to Team Cam.

On April 3, 2023, UFG sent letters to MDOT demanding that MDOT and the SHA refrain from releasing any funds on Team Cam's projects without UFG's consent, which effectively "froze" Team Cam's cash receivables, accounting for over 90 percent of Team Cam's revenue, and thus caused a "catastrophic liquidity problem." *Id.* ¶ 99.

On April 18, 2023, however, Scrivener called Blades and asked "Are you still able to get material? Who is still supplying you?" *Id.* ¶ 101. When Blades responded that M. Luis Construction ("M. Luis"), a small asphalt manufacturer in Glen Burnie, Maryland, was still providing asphalt to Team Cam, Scrivener laughed, told Blades that Reliable owned M. Luis's asphalt plant, and stated that Reliable "might take possession of the plant." *Id.* ¶ 102.

By April 20, 2023, F.O. Day was also refusing to sell to Team Cam unless Team Cam pre-paid, which was not a viable option in light of "Team Cam's liquidity situation." *Id.* ¶ 103. When Blades called Mike Day, F.O. Day's vice president and the company's "top decision-maker," to ask why F.O. Day had adopted this new policy, Mike Day stated, "I heard we should not be selling you asphalt anymore." *Id.* ¶ 104.

## IV.    Sale of Team Cam

In May 2023, a UFG representative called Blades in order to convince him to sell Team Cam and warned that if he did not, "his wife's family property would be imperiled, and even his children's financial security would be at risk." *Id.* ¶ 109. Without reliable asphalt suppliers and a bonding company, Blades realized that he had to sell Team Cam's assets. Among the Contractor Defendants, only Reliable submitted an offer, of $3 million, which was for less than half of Holcim's 2022 offer to acquire Team Cam. Blades accepted the offer. Before the agreement was finalized on July 24, 2023, UFG signed a release of all antitrust claims against D.A. Bramble on Team Cam's behalf and "pressured" Blades to add his signature to the release. *Id.* ¶ 112. As part of the sale, Blades and certain Team Cam employees became Reliable employees. On his first day of work with Reliable, Blades was called into a conference room where Scrivener put a Reliable hat on his head, laughed, and took a photograph that he sent to others.

## V.    The Complaint

On May 28, 2024, Team Cam filed the present Complaint against Reliable, F.O. Day, Allan Myers, Holcim, Midlantic, and the MAA, in which it asserts two claims against all Defendants: (1) a violation of section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and of the Maryland Antitrust Act, Md. Code Ann., Com. Law § 11–204, based on an alleged conspiracy to "eliminate Team Cam as a competitor" in the Eastern Maryland Paving Market; and (2) a violation of those same statutory provisions based on an alleged conspiracy to "impose extractive price terms on Team Cam in the form of provisions requiring the pass-through of state price adjustments and incentives." Compl. ¶¶ 130, 140.

11

## DISCUSSION

In their Motion to Dismiss, Defendants assert three arguments. First and second, they argue that pursuant to Federal Rule of Civil Procedure 12(b)(6), the Complaint should be dismissed because Team Cam has failed to allege sufficient facts to support either of its two claims. Third, they assert that the Complaint must be dismissed because Team Cam has failed to allege an antitrust injury and thus lacks antitrust standing to bring its claims.

## I.    Legal Standards

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . ." 15 U.S.C. § 1. To establish a violation of § 1, a plaintiff must prove "(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002). On a motion to dismiss a § 1 claim asserted against multiple defendants, the plaintiff must allege specific facts against each particular defendant that support the conclusion that that defendant engaged in a conspiracy in violation of the antitrust laws. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015).

12

For both Counts 1 and 2, the relevant provision of the Maryland Antitrust Act provides that "[a] person may not . . . [b]y contract, combination, or conspiracy with one or more other persons, unreasonably restrain trade or commerce." Md. Code Ann., Com. Law § 11–204(a)(1). Because this provision has been deemed to be "essentially the same as § 1 of the Sherman Antitrust Act," courts apply federal law relating to § 1 to a claim under this state law equivalent. *Natural Design, Inc. v. Rouse Co.*, 485 A.2d 663, 666 (Md. 1984). Accordingly, on both counts, the Court will consider the federal and state claims together. *See Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 279 n.2 (4th Cir. 2012) ("[T]here is no need to undertake separate analysis of the parallel Maryland antitrust claims, as resolution of those claims is subsumed in the Sherman Act analysis.").

## II.     Conspiracy to Eliminate Team Cam

As to Count 1, which alleges a conspiracy to eliminate Team Cam from the Eastern Maryland Paving Market, in violation of the Sherman Act and the Maryland Antitrust Act, Defendants seek dismissal on the grounds that the allegations are insufficient to establish either of the two required elements.

### A.     Conspiracy

For the first element, the existence of a conspiracy, a plaintiff must demonstrate "concerted activity" "in which multiple parties join their resources, rights, or economic power together in order to achieve an outcome that, but for the concert, would naturally be frustrated by their competing interests." *Va. Vermiculite, Ltd. v. Historic Green Springs, Inc.*, 307 F.3d 277, 281–82 (4th Cir. 2002); *see Estate Const. Co. v. Miller & Smith Holding Co., Inc.*, 14 F.3d 213, 220 (4th Cir. 1994) ("There must be at least two persons acting in concert."). Agreements that occur between "competitors at the same level of the market structure" are referred to as "horizontal,"

13

while agreements between "persons at different levels of the market structure" are referred to as "vertical." *United States v. Topco Associates, Inc.*, 405 U.S. 596, 608 (1972).

This element requires "direct or circumstantial evidence that reasonably tends to prove that" the conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984) (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir. 1980)). The "anticompetitive conduct" must stem "from an agreement, tacit or express." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)).

In antitrust cases, direct evidence, consisting of "explicit" evidence of an agreement that "requires no inferences," is "extremely rare" and "is usually referred to as the 'smoking gun.'" *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004) (quoting *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003)). Such evidence can alone establish a conspiratorial agreement. *See Robertson v. Sea Pines Real Estate Cos., Inc.*, 679 F.3d 278, 289 (4th Cir. 2012) (finding in an antitrust case that "[c]ircumstantial evidence" was "superfluous in light of the direct evidence" contained in "the by-laws of the agreement itself"). Direct evidence in an antitrust case can include:

> (1) [A] direct threat to the plaintiff from a competitor that if he went into business his competitors would do anything they could to stop him, including cutting prices or supplies; (2) advising distributors that a supplier would cut off access if the distributor failed to maintain a certain price level; (3) a memorandum produced by a defendant conspirator detailing the discussions from a meeting of a group of alleged conspirators; and (4) a public resolution by a professional association recommending that its members withdraw their affiliation with an insurer.

14

*Intervest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 162–63 (3d Cir. 2003) (internal citations omitted) (quoting *Intervest Fin. Servs., Inc. v. S.G. Cowen Secs. Corp.*, 206 F. Supp. 2d 702, 713 (E.D. Pa. 2002)).

Circumstantial evidence may include parallel action by the alleged co-conspirators, consisting of evidence that the defendants acted "similarly." *SD3, LLC*, 801 F.3d at 427 (quoting *Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co.*, 998 F.2d 1224, 1243 (3d Cir. 1993)). To establish a conspiracy based on circumstantial evidence alone, however, there must be "something more" than parallel action, and a plaintiff has the burden to "present evidence that tends to exclude the possibility that the alleged conspirators acted independently." *Parkway Gallery Furniture, Inc. v. Kittinger/Penn. House Grp., Inc.*, 878 F.2d 801, 805-06 (4th Cir. 1989) (citations omitted). Facts that speak to the requirement of "something 'more'" than mere parallel conduct are sometimes "characterized as 'parallel plus' or 'plus factors,'" and "must be evaluated holistically," as opposed to by "pars[ing] each 'plus factor' individually and ask[ing] whether that factor, standing alone, would be sufficient to provide the 'more.'" *SD3, LLC*, 801 F.3d at 424–25 (citations omitted).

Here, the Complaint includes ample allegations of both direct and circumstantial evidence that more than sufficiently state a plausible claim against all Defendants of a conspiracy to eliminate Team Cam from the Eastern Maryland Paving Market by, among other activities, agreeing to fix price terms by requiring Team Cam to pass through the price adjustments and incentives included in paving contracts, agreeing to file unjustified claims with and otherwise pressure Team Cam's surety to take action against Team Cam, agreeing to refuse outright to sell asphalt to Team Cam, and agreeing to sabotage Team Cam's bids.

15

First, as to the price-fixing agreement, Team Cam has alleged direct evidence that Reliable and the MAA, along with non-defendant D.A. Bramble, agreed that they would demand that Team Cam pass through the MDOT price adjustments and incentives to its asphalt suppliers. As alleged in the Complaint, when Blades asked the president of D.A. Bramble in October 2022 why that company was demanding such pass-through payments, he told Blades that "[c]olleagues at Reliable Contra[c]ting confirmed they charge you for the adjustments, and bill for" the state mix incentive. Compl. ¶ 76. Two weeks later, Reliable started demanding pass-through payments, and when Blades asked Scrivener, Reliable's COO, why it was doing so, Scrivener told Blades that he "had heard from the Association," referring to the MAA, that Reliable should be demanding the pass-through. *Id.* ¶ 78. Scrivener later admitted to Blades that he and Paul Bramble had discussed the issue of Team Cam and the pass-through of price adjustments and incentives while at an MAA meeting.

In addition to this direct evidence, circumstantial evidence also links Allan Myers to this aspect of the conspiracy. Specifically, in the same October 2022 email discussing Reliable, Bramble told Blades that Allan Myers "also required the pass-through" provision in its asphalt contracts with Team Cam, and just weeks before that, an Allan Myers representative sent an email to Team Cam asking if it "would like for [Allan Myers] to track the Mix, Density, AC and Fuel Pay Adjustments," when there was no reason to do so unless the price adjustments and incentives were going to be passed on to Allan Myers. *Id.* ¶¶ 73, 75. When these two communications relating to Allan Myers are considered alongside the direct evidence of an agreement to pass through price adjustment and incentives among other Defendants and D.A. Bramble, they support the inference that Allan Myers spoke to D.A. Bramble and agreed to be a part of the price-fixing

conspiracy as well. The allegations therefore sufficiently show that Reliable, Allan Myers, the MAA, in conjunction with D.A. Bramble, engaged in the conspiracy in Count 1.

The MAA's separate argument, that the claim against it should be dismissed because a "trade association is only liable under the Sherman Act if an action in violation of the Act is taken by a member of the association with the actual or apparent authority of the association itself," does not alter this conclusion. MAA Supp. to Mot. at 3, ECF No. 60. The case cited in support of that proposition, *American Society of Mechanical Engineers v. Hydrolevel Corp.*, 456 U.S. 556 (1982), did not establish such a rule and instead held only that such an association could be found liable under such a theory. *Id.* at 559, 577–78. Here, where there is direct evidence that the MAA informed Reliable that it should be demanding the pass-through payments, MAA's liability is premised not on the actions of its members, but on "concerted action" while acting "as an entity." *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1007 (3d Cir. 1994) (finding that a trade association can be held liable under § 1 of the Sherman Act when the entity engages in such "concerted action").

Second, there is direct and circumstantial evidence that Defendants agreed to file unjustified bond claims and to otherwise pressure UFG to take action against Team Cam as its surety. Team Cam has pleaded direct evidence showing that Midlantic essentially admitted that it was engaged in such a conspiracy. The Complaint asserts that in late October 2022, when Blades asked Midlantic's president, Deeley, why Midlantic had filed a bond claim with UFG even though Midlantic had not actually completed the work underlying the claim, Deeley told Blades that those in the industry "stick together," and that a supplier friend had told him that "it would be beneficial" for Midlantic to file the claim. Compl. ¶ 85. In addition to this direct evidence, the Complaint alleges parallel action in that non-defendant D.A. Bramble filed an unjustified bond claim with

17

UFG on November 15, 2022, and Holcim filed an unjustified bond claim with UFG in January 2023, even though Holcim actually owed Team Cam a substantial sum at that time. The Complaint also alleges that in April 2023, Allan Myers, without prompting, reached out to UFG to inform it that Allan Myers was no longer going to supply asphalt to Team Cam. When this parallel conduct is considered alongside the direct admission by Midlantic, it supports an inference that Midlantic was part of a conspiracy to drive Team Cam from the market.

Third, there is direct and circumstantial evidence of an agreement to stop selling asphalt to Team Cam. In the same October 2022 discussion with Blades in which he admitted to being in a conspiracy to harm Team Cam by filing an unjustified bond with its surety, Midlantic's president also told Blades that "folks in the industry say that they won't even sell you asphalt if you had cash." *Id.* ¶ 85. Then, in April 2023, when Blades asked F.O. Day's vice president, Mike Day, why F.O. Day was suddenly demanding that Team Cam pre-pay for asphalt, Day responded, "I heard we should not be selling you asphalt anymore." *Id.* ¶ 104. Significantly, by early April 2023, Holcim, Reliable, Allan Myers, and D.A. Bramble were all refusing to supply Team Cam with asphalt.

Finally, the allegations in the Complaint describe circumstantial evidence that F.O. Day and Holcim agreed to sabotage Team Cam's April 2022 winning bid on the Calvert County Project, consisting of (1) F.O. Day's submission of an asphalt mix used with Team Cam's bid that did not conform with the specifications for the project, which allowed Holcim to secure the contract as the second-place finisher; (2) F.O. Day's allegedly false statement to Team Cam that it "did not even produce the asphalt mix specified for the project" even though it submitted the proper mix the following year, *id.* ¶ 59; and (3) the fact that after Holcim won the 2023 contract for the same project, the following year it submitted a bid with an unusually high asphalt price that appeared to

18

allow F.O. Day to win the contract that year. Viewing these allegations in the light most favorable to Team Cam, and when considered alongside the direct and circumstantial evidence of other forms of concerted action to drive Team Cam from the Eastern Maryland Paving Market, these facts provide further support for the conclusion that F.O. Day and Holcim were part of such a conspiracy.

Where Team Cam has alleged direct evidence alongside circumstantial evidence, Team Cam has properly alleged the "something more" than parallel conduct required to support an inference of an antitrust conspiracy, which generally consists of "further circumstance[s] pointing toward a meeting of the minds." *SD3, LLC*, 801 F.3d at 424 (quoting *Bell Atl. Corp.*, 550 U.S. at 557). Consideration of the "plus factors" referenced in *SD3* further bolsters the Court's conclusion that Team Cam has alleged sufficient facts to support its conspiracy claim. Those factors include: (1) "the 'who, what, when, and where' of the claimed antitrust misconduct"; (2) the "why," or "[m]otivation for common action"; (3) "[a]llegations of communications and meetings among conspirators," which can provide "the means and opportunity to conspire"; and (4) "a market in which sales power is concentrated in the hands of the few." *Id.* at 430–33 (citations omitted).

Here, as to the first and third factors, as discussed above, the Complaint provides highly detailed allegations describing Defendants' allegedly collusive conduct, including the dates and details of specific communications involving Defendants, often as described by Defendants' own representatives, that in some instances provide direct evidence of collusion. As to the fourth factor, Team Cam has pleaded facts supporting the conclusion that the Eastern Maryland Paving Market is "concentrated in the hands of the few," specifically that when it entered the market in 2019, the four Contractor Defendants and D.A. Bramble accounted for 97 percent of the value of contracts

19

awarded in that market. *SD3, LLC*, 801 F.3d at 432 (finding that a market was concentrated where the defendants "purportedly control[led] 85% of that market").

The concentration of the market is also relevant to the second factor, as Team Cam has alleged facts showing that it expanded significantly from 2019 to 2022, in part by growing its revenues from \$5.9 million in 2019 to \$16.3 million in 2021, and that the combined market share of the Contractor Defendants and D.A. Bramble declined to 91 percent in 2022. Where there was an incentive to drive Team Cam out of the market, concerted action was needed because, as alleged in the Complaint, it would not have been in a single Contractor Defendant's self-interest to unilaterally refuse to supply asphalt to Team Cam, or to require pass-throughs of price adjustments and incentives, because doing so would undermine that Defendant's ability to profit from projects awarded to Team Cam and would not actually drive Team Cam from the market.

When the direct evidence, circumstantial evidence, and plus factors are considered collectively, Team Cam has sufficiently alleged the element of a conspiracy by asserting facts showing a concerted effort employing a variety of means to drive Team Cam out of the Eastern Maryland Paving Market. *See SD3, LLC*, 801 F.3d at 418, 427–28, 434 (reversing in part the grant of a motion to dismiss where the plaintiff had sufficiently alleged a plausible claim of a § 1 conspiracy to engage in a group boycott of the plaintiff's new safety technology for table saws even where there was no allegation that there was an agreed upon, common manner of preventing the plaintiff's entry into the market, and the defendants took varying approaches to negotiations with the plaintiff).

### B.    Unreasonable Restraint of Trade

For the second element, an unreasonable restraint on trade, the mode of analysis depends on the type of restraint imposed: (1) "*per se* analysis" applies to "obviously anticompetitive

20

restraints," while (2) "quick-look analysis" applies to those "with some procompetitive justification," and (3) "rule of reason" analysis applies to "restraints whose net impact on competition is particularly difficult to determine." *Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508–09 (4th Cir. 2002).

Restraints of trade that are *per se* unlawful include those that can be deemed to have a "predictable and pernicious anticompetitive effect" with "limited potential for procompetitive benefit," without any need for "detailed study of the markets" "or the actual effect of those restraints on competition." *Id.* (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)). "The critical analysis in determining whether a particular activity constitutes a *per se* violation is whether the activity on its face seems to be such that it would always or almost always restrict competition and decrease output instead of being designed to increase economic efficiency and make the market more rather than less competitive." *Nat'l Elec. Contractors Ass'n, Inc. v. Nat'l Constructors Ass'n*, 678 F.2d 492, 500 (4th Cir. 1982). Among the practices that are *per se* violations are "price fixing, horizontal output restraints, and market-allocation agreements." *Continental Airlines, Inc.*, 277 F.3d at 509. Further, "certain concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as *per se* violations of § 1 of the Sherman Act." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 290 (1985).

Where Team Cam alleges in Count 1 that Defendants "conspired, combined, and acted in concert to eliminate Team Cam as a competitor" in the Eastern Maryland Paving Market, in part by "collectively refusing to sell asphalt to Team Cam or imposing such onerous terms as to make such purchases economically [i]nfeasible," Compl. ¶ 130, Team Cam has alleged a *per se* violation of the Sherman and Maryland Antitrust Acts based on a group boycott theory. *See Nw. Wholesale*

*Stationers, Inc*, 472 U.S. at 290, 294 (noting that group boycotts "often cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete" and that "frequently the boycotting firms possess[] a dominant position in the relevant market"); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 209, 212–13 (1959) (finding that an alleged conspiracy to refuse to sell household appliances to a retail store at all, or to sell only at discriminatory prices, constituted a group boycott that is a "forbidden" restraint of trade).  Likewise, the allegations relating to concerted action to require Team Cam to pass-through price adjustments and incentives plausibly alleges a *per se* violation in the form of price fixing.  *See Continental Airlines, Inc.*, 277 F.3d at 509.  The Court thus need not address quick-look or rule of reason analysis.  Where Team Cam has sufficiently alleged both a conspiracy and an unreasonable restraint of trade, the Court finds that it has stated in Count 1 a valid claim of a violation of § 1 of the Sherman Act and of the Maryland Antitrust Act.

**III.    Conspiracy to Fix Price Terms**

In Count 2, Team Cam alleges that Defendants conspired "to impose extractive price terms on Team Cam in the form of provisions requiring the pass-through of state price adjustments and incentives."  Compl. ¶ 140.  As with Count 1, the elements of this claim are "(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade."  *Dickson*, 309 F.3d at 202.

**A.    Conspiracy**

As discussed above, Team Cam asserted in Count 1 that this conspiracy was a constituent part of the larger conspiracy to eliminate Team Cam from the Eastern Maryland Paving Market.  Based on the Court's analysis of the facts relating to that aspect of the conspiracy alleged in Count 1, the Court finds that the Complaint alleges sufficient facts to support a plausible claim that

Reliable, the MAA, and Allan Myers, as well as non-defendant D.A. Bramble, all engaged in this more specific conspiracy alleged in Count 2 by agreeing to require Team Cam to pass-through to its asphalt suppliers the price adjustments and incentives included in the paving contracts. *See supra* part II.A.

The Complaint, however, lacks any factual allegations that connect Defendants Holcim and Midlantic to the price-fixing conspiracy. Accordingly, the Court will grant the Motion as to the claims in Count 2 against Holcim and Midlantic. *See SD3, LLC*, 801 F.3d at 422 (stating that if a complaint in an antitrust case "fails to allege particular facts against a particular defendant, then the defendant must be dismissed").

As for F.O. Day, the sole allegation in the Complaint that arguably links F.O. Day to the price-fixing conspiracy is the statement that F.O. Day's president, Francis Day, IV, was a director of the MAA in 2022, which was when Scrivener, Reliable's COO, allegedly told Blades that he "had heard from the [MAA]" that Reliable should be demanding pass-through payments. Compl. ¶ 78. However, "[a] business that belongs to a trade association does not become liable for violating the antitrust laws simply because the trade association is liable for such violation." *Winn-Dixie Stores, Inc. v. E. Mushroom Marketing Coop., Inc.*, 89 F.4th 430, 442 (3d Cir. 2023). Although the fact that Francis Day, IV is a member of the MAA Board of Directors raises legitimate questions about whether F.O. Day joined in the conspiracy between the MAA and certain member companies, and discovery may reveal evidence of such participation in the conspiracy, this single allegation is insufficient at the pleading stage to support a viable claim against F.O. Day on Count 2. Accordingly, the Court will also grant the Motion as to the claim in Count 2 against F.O. Day. *See SD3, LLC*, 801 F.3d at 422.

23

**B.    Unreasonable Restraint of Trade**

As discussed above in relation to the first elements of Counts 1 and 2, Team Cam has alleged sufficient facts to support a determination of price fixing consisting of an agreement among certain Defendants to require Team Cam to pass-through price adjustments and incentives to its asphalt suppliers. *See supra* parts II.A, III.A.  As discussed above in relation to Count 1, price fixing is a *per se* violation of the Sherman Act and the Maryland Antitrust Act which establishes an unreasonable restraint of trade without the need for further analysis. *See supra* part II.B; *Continental Airlines, Inc.*, 277 F.3d at 509.  More specifically, horizontal price fixing, such as the alleged conspiracy asserted in Count 2 among Reliable, the MAA, Allan Myers, and non-defendant D.A. Bramble, is a restraint on trade that is "illegal *per se*." *Nat'l Elec. Contractors Ass'n, Inc.*, 678 F.2d at 496–97, 500–01 (finding that an agreement to add a 1 percent charge to all electrical construction contracts involving a specific labor union, in order to fund an electrical contractor trade association regardless of whether the contractor was a member of that trade association, constituted price fixing that was "illegal per se"); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940) ("Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se*.").  Accordingly, Team Cam has sufficiently pleaded an unreasonable restraint of trade as to Count 2, and consequently, it has pleaded a plausible violation of the Sherman Act and of the Maryland Antitrust Act in Count 2.

**IV.    Antitrust Injury**

Finally, Defendants seek dismissal based on their assertion that Team Cam has not pleaded an "antitrust injury" and thus has not established "antitrust standing."  Mot. at 23, ECF No. 59-1. Plaintiffs have a private right of action to enforce federal antitrust laws based on Section 4 of the

24

Clayton Act, 15 U.S.C. § 15, which provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor." *Id.* Despite this broad language, "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262–63 n.14 (1972). The United States Supreme Court has therefore held that to advance a claim pursuant to this provision, a plaintiff must have "antitrust standing," which is separate and distinct from Article III standing. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983); *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 310 (4th Cir. 2007). Whether a plaintiff is sufficiently connected to the antitrust violation so as to have antitrust standing requires the consideration of the following factors:

> (1) [T]he causal connection between an antitrust violation and harm to the plaintiffs, and whether that harm was intended; (2) whether the harm was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws; (3) the directness of the alleged injury; (4) the existence of more direct victims of the alleged antitrust injury; and (5) problems of identifying damages and apportioning them among those directly and indirectly harmed.

*Novell, Inc.*, 505 F.3d at 311 (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 324 (4th Cir. 2006)). "The first two of these antitrust-standing factors together encompass the concept of 'antitrust injury.'" *Id.* (quoting *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986)).

The Maryland Antitrust Act has a comparable provision providing a private right of action which states that "[a] person whose business or property has been injured or threatened with injury by a violation of § 11–204 of this subtitle may maintain an action for damages or for an injunction or both against any person who has committed the violation." Md. Code Ann., Com. Law § 11–209(b)(2)(i). Where the Maryland Antitrust Act specifically provides that in construing its provisions, courts should "be guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters," including 15 U.S.C. § 15, *see* Md. Code

Ann., Com. Law § 11–202(a)(2)(ii), the Court will consider the federal and state law claims together in relation to this issue. *See havePOWER, LLC v. General Electric Co.*, 183 F. Supp. 2d 779, 785 & n.4 (D. Md. 2002) (considering the federal standard for antitrust injury in assessing a claim under the Maryland Antitrust Act).

Here, based on the Court's analysis of the allegations in the Complaint in relation to the specific claims at issue, Team Cam has sufficiently pleaded the first factor for antitrust injury, that there was a "causal connection between an antitrust violation and harm to the plaintiffs" and that the "harm was intended." *Novell, Inc.*, 505 F.3d at 311 (quoting *Kloth*, 444 F.3d at 324). As to this factor, "colorable allegations that [a plaintiff] has lost income as a direct result of the defendants' anti-competitive actions . . . states a causal antitrust injury with sufficient specificity." *Advanced Health-Care Servs., Inc. v Radford Cmty. Hosp.*, 910 F.2d 139, 149 (4th Cir. 1990). The Complaint alleges that as part of the conspiracy to eliminate Team Cam from the Eastern Maryland Paving Market alleged in Count 1, on April 3, 2023, UFG demanded that MDOT and the SHA "release no further funds" to Team Cam for its projects without UFG's consent, effectively freezing "Team Cam's cash receivables, which accounted for approximately 90-95% of Team Cam's revenue." Compl. ¶ 99. As discussed above, the allegations support the conclusion that UFG took this action as a result of the various unjustified bond claims filed against Team Cam by D.A. Bramble, Midlantic, and Holcim, and after D.A. Bramble, Holcim, Reliable, and Allan Myers had all begun refusing to sell asphalt to Team Cam. Moreover, Team Cam has specifically and plausibly alleged that because of UFG's freezing of Team Cam's cash receivables and Defendants' collective refusal to sell asphalt to it, Team Cam was forced to sell its assets to Reliable at a price far below the proposed sales price to Holcim one and a half years before. Furthermore, the allegations that (1) Midlantic's president, Deeley, told Blades that those in the industry "stick

26

together," that he was told that "it would be beneficial" for him to file Midlantic's unjustified bond claim, and that "folks in the industry say that they won't even sell you asphalt if you had cash," Compl. ¶ 85; and (2) that F.O. Day's vice president told Blades that he "heard we should not be selling you asphalt anymore," *id.* ¶ 104, support the conclusion that the refusal to supply asphalt to Team Cam and the resulting harm were intentional. Accordingly, the Complaint sufficiently alleges that Defendants' concerted action to file unjustified bond claims and to refuse to sell asphalt to Team Cam intentionally caused financial harm to Team Cam.

As for the conspiracy to fix prices for the sale of asphalt to Team Cam, as discussed above, the Complaint alleges sufficient facts to support the conclusion that Reliable and Allan Myers, along with non-defendant D.A. Bramble, agreed that, contrary to industry practice, they would demand that Team Cam pass through MDOT price adjustments and incentives to them, which necessarily raised Team Cam's costs and thus caused it financial harm. Where Scrivener, Reliable's COO, admitted to Blades that he "had heard from the [MAA]" that Reliable should require this pass-through, Compl. ¶ 78, the allegations support a finding that this harm was intentional. The Court finds that Team Cam has also pleaded sufficient facts to establish a causal connection between Defendants' alleged price-fixing conspiracy and an intentional harm to Team Cam.

As for the second factor of antitrust injury, these alleged injuries suffered from Defendants' alleged antitrust violations are of the "type that Congress sought to redress in providing a private remedy for violations of the antitrust laws." *Novell, Inc.*, 505 F.3d at 311. Antitrust injuries need not necessarily result in an "actual lessening of competition," but they "should reflect the anticompetitive effect either of the violation[s] or of anticompetitive acts made possible by the violation[s]." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 & n.14 (1977). In

27

particular, "'competitors suffer antitrust injury when they are forced from the market by exclusionary conduct' like a refusal to sell." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 710 n.8 (4th Cir. 2021) (quoting *Viamedia, Inc. v. Comcast Co.*, 951 F.3d 429, 482 (7th Cir. 2020)). Similarly, "being forced to pay supra-competitive prices as a result of the defendants' anti-competitive conduct" is "an injury plainly . . . 'of the type the antitrust laws were intended to prevent.'" *In re DDVAP Direct Purchaser Antitrust Litig.*, 585 F.3d 667, 688 (2d Cir. 2009) (quoting *Brunswick Corp.*, 429 U.S. at 489).

Here, Team Cam has properly alleged these precise forms of antitrust injury. In Count 1, Team Cam has alleged that Defendants conspired to refuse to sell asphalt to it and thus forced it out of the Eastern Maryland Paving Market. *See supra* part II. In Count 2, Team Cam has alleged sufficient facts to demonstrate that it was "forced to pay supra-competitive prices" for asphalt when Reliable and Allan Myers, allegedly at the MAA's direction, conspired to compel Team Cam to surrender MDOT price adjustments and incentives, and thus pay higher prices, to acquire asphalt from these Defendants. *In re DDVAP Direct Purchaser Antitrust Litig.*, 585 F.3d at 688; *see supra* part III. While a lessening of competition is not necessarily required, Team Cam has specifically alleged that competition was reduced because it was forced out of the market by Defendants' concerted action. Where the Court concludes that Team Cam has alleged an antitrust injury for both of its claims, this argument for dismissal fails.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss will be GRANTED IN PART and DENIED IN PART. The Motion will be granted in part in that Count 2 will be dismissed as to Defendants F.O. Day, Holcim, and Midlantic. The Motion will be otherwise denied. A separate Order shall issue.

Date: April 3, 2025

THEODORE D. CHUANG
United States District Judge